1  Walter J. Lipsman, Esq., SBN 77212
2  Christopher G. Foster, Esq., SBN 119142
   Richard E. Stultz, Esq., SBN 227718
3  Sudhir Lay Burgaard, Esq., SBN 263805
4  **MORRIS POLICH & PURDY LLP**
   1055 West 7th Street, 24th Floor
5  Los Angeles, California 90017
   Telephone: (213) 891-9100
6  Facsimile: (213) 488-1178
   wlipsman@mpplaw.com
7  cfoster@mpplaw.com
8  rstultz@mpplaw.com
   sburgaard@mpplaw.com
9

FILED
CLERK, U.S. DISTRICT COURT

OCT - 4 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

10  Attorneys for Plaintiff,
    HOUSING AUTHORITY OF THE CITY OF LOS ANGELES
11

12  **UNITED STATES DISTRICT COURT**

13  **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 14  HOUSING AUTHORITY OF THE CITY OF LOS ANGELES | Case No.: CV11 01626 FMO (CWx) |
| 15         Plaintiff, | |
| 16  v. | **FIFTH AMENDED COMPLAINT FOR:** |
| 17  PCC TECHNICAL INDUSTRIES, INC., a Delaware Corporation, GK | |
| 18  TECHNOLOGIES, INCORPORATED, a New Jersey and California Corporation, | 1)   **COST RECOVERY (42 U.S.C.A § 9607);** |
| 19  SOUTHWEST STEEL ROLLING MILLS, INC., a dissolved California | 2)   **CONTRIBUTION AND/OR** |
| 20  Corporation, CASCADE STEEL ROLLING MILLS, INC., an Oregon | **INDEMNITY (CALIFORNIA HEALTH & SAFETY CODE §** |
| 21  Corporation, BECKER BROS. STEEL SUPPLY CO., a California Corporation, | **25363, SUBD. (e));** |
| 22  SHAMA, A GENERAL PARTNERSHIP, a California general partnership, SHAMA, | 3)   **PRIVATE NUISANCE (CALIFORNIA CIVIL CODE §** |
| 23  LLC, a California Limited Liability Company, BLUE TEE CORP., a | **3479);** |
| 24  Delaware Corporation, dba BROWN-STRAUSS STEEL, ENERFAB, INC., an | 4)   **TRESPASS;** |
| 25  Ohio Corporation, formerly known as BISHOPRIC PRODUCTS COMPANY, | 5)   **NEGLIGENCE;** |
| 26  APL LIMITED, a Delaware Corporation, PACER INTERNATIONAL, INC., a | 6)   **DECLARATORY RELIEF; AND** |
| 27  Tennessee Corporation, CAMBRIDGE STEEL, LLC, a California Limited | 7)   **NEGLIGENT MISREPRESENTATION** |
| 28 | |

L0455215.DOC                          1

Liability Company, FINKELSTEIN FOUNDRY SUPPLY CO., a dissolved California corporation, FINKELSTEIN SUPPLY COMPANY, a dissolved California general partnership, FINKELSTEIN FOUNDATION, a dissolved California non-profit corporation, CLEARVIEW DEVELOPMENT COMPANY, INC., a dissolved California corporation, PRUDENTIAL EQUIPMENT CO., INC., a dissolved California corporation, HILLSIDE INDUSTRIES, INC., a dissolved California corporation, LESTER RUBEN CORPORATION NO. 1, a dissolved California corporation, formerly known as SOUTHWEST STEEL ROLLING MILLS, LESTER RUBEN CORPORATION NO. 2, a dissolved California corporation, formerly known as ECONOMY STEEL CONSTRUCTION CO., INC., LESTER RUBEN CORPORATION NO. 3, a dissolved California corporation, formerly known as ECONOMY STEEL CONSTRUCTION COMPANY OF CALIFORNIA, SOUTHWEST STEEL ROLLING MILLS OF ARIZONA, a dissolved Arizona corporation, SOUTHWEST STEEL ROLLING MILLS OF NEVADA, a dissolved Nevada corporation, ESTATE OF LESTER M. FINKELSTEIN, DECEASED, ESTATE OF RUBEN FINKELSTEIN, DECEASED, 9901 ALAMEDA, LLC, JOHN MADDUX, an individual, AND DOES 1 TO 10, INCLUSIVE,

    Defendants.

**DEMAND FOR JURY TRIAL**

L0455215.DOC

2

Plaintiff, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES ("HACLA"), alleges as follows:

## JURISDICTION

1.      This action arises under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), title 42, § 9601 et seq., of the United States Code, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1976), and California Health & Safety Code § 25363, subd. (e).

2.      All of plaintiff's claims for relief contained in this complaint arise out of the same transactions and occurrences as the claim asserted under CERCLA.

3.      This court has jurisdiction of this action pursuant to 42 U.S.C.A. § 9613(b), 28 U.S.C.A. § 1331 and principles of supplemental jurisdiction.

## VENUE

4.      Venue in this court is proper under 42 U.S.C.A. § 9613(b), as the releases of hazardous substances and petroleum hydrocarbons, damages, acts, transactions and occurrences alleged in this complaint were committed within this judicial district.  Venue is further proper as the property, which is the subject of this litigation, is within this judicial district.

## THE PARTIES

5.      Plaintiff, HACLA, is, and at all times relevant to this complaint was, a state of California-chartered public body, corporate and politic.  It owns and provides affordable public housing to residents in and about Los Angeles.

6.      Defendant, PCC TECHNICAL INDUSTRIES, INC., is, and at all times relevant to this complaint was, a Delaware corporation.  At all times relevant to this complaint, it, and, or, its predecessors, carried on business in Los Angeles County, California.

///

L0455215.DOC                                                    1

7.    Defendant, SOUTHWEST STEEL ROLLING MILLS, INC., is currently a dissolved California corporation.  At all times relevant to this complaint, it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

8.    Defendant, GK TECHNOLOGIES, INCORPORATED, is, and at all times relevant to this complaint was, a New Jersey and California corporation.  At all times relevant to this complaint, it, and, or, its predecessors, carried on business in Los Angeles County, California.

9.    Defendant, CASCADE STEEL ROLLING MILLS, INC., is, and at all times relevant to this complaint was, an Oregon corporation.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

10.    Defendant, BECKER BROS. STEEL SUPPLY CO., is, and at all times relevant to this complaint was, a California corporation.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

11.    Defendant, SHAMA, A GENERAL PARTNERSHIP, is, and at all times relevant to this complaint was, a California general partnership.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

12.    Defendant, SHAMA, LLC, is, and at all times relevant to this complaint was, a California limited liability company.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

13.    Defendant, BLUE TEE CORP., dba BROWN-STRAUSS STEEL, is, and at all times relevant to this complaint was, a Delaware corporation.  At all times relevant to this complaint, it, and, or, its predecessors, carried on business in Los Angeles County, California.

///

///

///

L0455215.DOC

2

14.     Defendant, ENERFAB, INC., is, and at all times relevant to this complaint was, an Ohio corporation, who was formerly known as BISHOPRIC PRODUCTS COMPANY.  At all times relevant to this complaint, it, and, or, its predecessors, carried on business in Los Angeles County, California.

15.     Defendant, APL LIMITED, is, and at all times relevant to this complaint was, a Delaware corporation.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

16.     Defendant, PACER INTERNATIONAL, INC., is, and at all times relevant to this complaint was, a Tennessee corporation.  At all times relevant to this complaint, it, and, or, its predecessors, carried on business in Los Angeles County, California.

17.     Plaintiff alleges that defendant, PACER INTERNATIONAL, INC., is the successor to American President Intermodal Co., Ltd., and to APL Land Transport Services, Inc.

18.     Defendant, CAMBRIDGE STEEL, LLC, is, and at all times relevant to this complaint was, a California limited liability company.  At all times relevant to this complaint, it carried on business in Los Angeles County, California.

19.     Defendant, FINKELSTEIN FOUNDRY SUPPLY CO., is currently a dissolved California corporation.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

20.     Defendant, FINKELSTEIN SUPPLY COMPANY, is currently a dissolved California general partnership, formerly consisting of Neil Finkelstein, Lester M. Finkelstein and Ruben Finkelstein.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

///

///

21.   Defendant, FINKELSTEIN FOUNDATION, is currently a dissolved California non-profit corporation.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

22.   Defendant, CLEARVIEW DEVELOPMENT COMPANY, INC., is currently a dissolved California corporation.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

23.   Defendant, PRUDENTIAL EQUIPMENT CO., INC., is currently a dissolved California corporation.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

24.   Defendant, HILLSIDE INDUSTRIES, INC., is currently a dissolved California corporation.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

25.   Defendant, LESTER RUBEN CORPORATION NO. 1, is currently a dissolved California corporation, which was formerly known as SOUTHWEST STEEL ROLLING MILLS.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in, Los Angeles County California.

26.   Defendant, LESTER RUBEN CORPORATION NO. 2, is currently a dissolved California corporation, which was formerly known as ECONOMY STEEL CONSTRUCTION CO., INC.  At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

///

27.   Defendant, LESTER RUBEN CORPORATION NO. 3, is currently a dissolved California corporation, which was formerly known as ECONOMY STEEL CONSTRUCTION COMPANY OF CALIFORNIA.   At all times relevant to this complaint it existed and operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

28.   Defendant, SOUTHWEST STEEL ROLLING MILLS OF ARIZONA, is currently a dissolved Arizona corporation.   At all times relevant to this complaint it operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

29.   Defendant, SOUTHWEST STEEL ROLLING MILLS OF NEVADA, is currently a dissolved Nevada corporation.   At all times relevant to this complaint it operated under the laws of the State of California, and it, and, or, its predecessors, carried on business in Los Angeles County, California.

30.   Defendant, ESTATE OF LESTER M. FINKELSTEIN, DECEASED, is the depository of decedent, Lester M. Finkelstein's, assets consisting, in part, of liability insurance. At all times relevant to this complaint, decedent, Lester M. Finkelstein, was a resident of, and carried on business in, Los Angeles County, California.   Hereinafter beginning with paragraph 34, the term "defendant" or "defendants" also includes decedent, Lester M. Finkelstein—except for paragraphs 83-89 (Fifth Claim for Relief (Negligence)).

31.   Defendant, ESTATE OF RUBEN FINKELSTEIN, DECEASED, is the depository of decedent, Ruben Finkelstein's, assets consisting, in part, of liability insurance.   At all times relevant to this complaint, decedent, Ruben Finkelstein, was a resident of, and carried on business in, Los Angeles County, California. Hereinafter beginning with paragraph 34, the term "defendant" or "defendants" also includes decedent, Ruben Finkelstein--except for paragraphs 83-89 (Fifth Claim for Relief (Negligence)).

*Does and All Defendants*

32.   The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named herein as DOES 1 through 10, are unknown to HACLA, who therefore sues said defendants under such fictitious names. HACLA will amend this complaint to allege the true names and capacities of the Doe defendants when ascertained.

33.   At all times relevant to this complaint, Does 1 through 10, and each of them, carried on business in Los Angeles County, California.

34.   At all times relevant to this complaint, defendants, including Does 1 through 5, and each of them, were the agents, successors, assigns, alter egos, employees, joint venturers, shareholders, directors, officers, financial partners and, or, partners of certain of the other defendants and, in doing the things alleged herein, were acting within the course and scope of that agency or relationship or were otherwise responsible for the wrongs alleged herein.

35.   At all times relevant to this complaint, Does 6 through 10, and each of them, owned and, or, operated one or more steel mills, steel storage, steel sales and, or, transportation businesses and, or, owned and, or, operated the real property located at 9901 S. Alameda Street, City of Los Angeles, Los Angeles County, California (hereafter referred to as "the Site").

36.   On information and belief, plaintiff alleges that the Site comprises approximately 21.1 acres; and that street addresses associated with the Site over the years include, among potentially others, 9731, 9739, 9901 and 9975 S. Alameda Street.

37.   From, or about, March 31, 2008, continuously to the present time, plaintiff has owned, and is the owner of, the Site.

///

///

///

**HACLA'S [PROPOSED] FIFTH AMENDED COMPLAINT FOR COST RECOVERY, CONTRIBUTION, COMMON LAW CAUSES OF ACTION, DECLARATORY RELIEF AND NEGLIGENT MISREPRESENTATION; DEMAND FOR JURY TRIAL**

## GENERAL ALLEGATIONS

38.     Plaintiff is informed and believes, and on that basis alleges, that defendants, and each of them, owned and, or, operated one or more steel mills, steel storage, steel sales and, or, transportation businesses and, or, owned and, or, operated the Site.

39.     Plaintiff alleges that, from, or about, April 1987 through December 2004, defendant, PACER INTERNATIONAL, INC., leased approximately 14.7 acres of the Site.    That portion of the Site which PACER INTERNATIONAL, INC., leased was composed of the north-northeast approximately 4.3 acres of the Site, adjacent to Alameda Street, and the contiguous west approximately 10.4 acres of the Site.

40.     Plaintiff alleges that defendant, PACER INTERNATIONAL, INC., owned and, or, operated a transportation and, or, mobile storage container business on that portion of the Site which it leased.

41.     Plaintiff alleges that defendant, PACER INTERNATIONAL, INC., directly and, or, through contractors and, or, subcontractors, operated the transportation and, or, mobile storage container business on that portion of the Site which it leased.

42.     Plaintiff alleges that defendant, PACER INTERNATIONAL, INC., used and occupied that portion of the Site which it leased for parking, storing, inspecting, maintaining and repairing trailer chassis, empty trailers, empty containers and vehicles, including, but not limited to, semi-trucks, and for incidental uses.

43.     Plaintiff is informed and believes that defendants, and each of them, used, processed, produced, stored, treated and, or, generated antimony, arsenic, cadmium, copper, lead, mercury, zinc and other metals, volatile organic compounds, polyaromatic hydrocarbons, polychlorinated biphenyls, other hazardous substances and petroleum hydrocarbons in the course of their, and its, operations at the Site.

///

///

///

L0455215.DOC

7

**HACLA'S [PROPOSED] FIFTH AMENDED COMPLAINT FOR COST RECOVERY, CONTRIBUTION, COMMON LAW CAUSES OF ACTION, DECLARATORY RELIEF AND NEGLIGENT MISREPRESENTATION; DEMAND FOR JURY TRIAL**

44.     Plaintiff alleges that defendant, PACER INTERNATIONAL, INC., used, stored and, or, generated, among others, vehicle batteries, vehicle tires, diesel, gasoline, motor oil, transmission fluid, lubricating oil, motor coolant, automotive fluid additives and motor and automotive body cleaning fluids on that portion of the Site which it leased.

45.     Plaintiff alleges that the vehicle batteries, vehicle tires, diesel, gasoline, motor oil, transmission fluid, lubricating oil, motor coolant, automotive fluid additives and motor and automotive body cleaning fluids, among others, which defendant, PACER INTERNATIONAL, INC., used, stored and, or, generated on that portion of the Site which it leased contained antimony, arsenic, cadmium, copper, lead, mercury, zinc, other metals, volatile organic compounds, polyaromatic hydrocarbons, polychlorinated biphenyls, other hazardous substances and petroleum hydrocarbons.

46.     Plaintiff is informed and believes, and on that basis alleges, that defendant, PACER INTERNATIONAL, INC., defendants, and each of them, caused or contributed to the spilling, leaking, disposal and release of antimony, arsenic, cadmium, copper, lead, mercury, zinc and other metals, volatile organic compounds, polyaromatic hydrocarbons, polychlorinated biphenyls, other hazardous substances and petroleum hydrocarbons during their, and its, ownership and, or, operation of the Site, whether its facilities or real property, thereby creating a condition of hazardous substance and petroleum hydrocarbon contamination at the Site, including, but not limited to, that portion of the Site leased by defendant, PACER INTERNATIONAL, INC.

47.     Plaintiff alleges on information and belief that defendant, PACER INTERNATIONAL, INC., graded and excavated soil, paved and maintained, repaired and constructed improvements which disturbed soil on that portion of the Site which it leased.   Plaintiff further alleges on information and belief that defendant, PACER INTERNATIONAL, INC., performed these grading, excavating, paving, maintenance, repair and construction activities at the Site beginning in, or about, May 1987 and

1  continuing on repeated occasions throughout the period it leased a portion of the Site to
2  as late as 2004.

3      48.    Plaintiff alleges on information and belief that the grading, excavating,
4  paving, maintenance, repair and construction activities performed by defendant, PACER
5  INTERNATIONAL, INC., spread hazardous substance (including antimony, arsenic,
6  cadmium, copper, lead, mercury, zinc and other metals, volatile organic compounds,
7  polyaromatic hydrocarbons, polychlorinated biphenyls, other hazardous substances) and
8  petroleum hydrocarbon contamination accumulated from the previous nearly 49-years of
9  steel manufacturing and other industrial operations present on that portion of the Site
10 leased by PACER INTERNATIONAL, INC., to areas not previously contaminated.

11     49.    Plaintiff is informed and believes, and on that basis alleges, that defendant,
12 PACER INTERNATIONAL, INC., defendants, and each of them, during their, and its,
13 ownership and, or, operation of the Site, whether its facilities or real property, allowed
14 the creation of, and, or, worsened, the condition of hazardous substance and petroleum
15 hydrocarbon contamination at the Site, including, but not limited to, that portion of the
16 Site leased by defendant, PACER INTERNATIONAL, INC.

17     50.    As a result of the condition of hazardous substance and petroleum
18 hydrocarbon contamination at the Site, plaintiff undertook investigation and
19 characterization response actions from about March 2008, and continuing through the
20 date of this (amended) complaint.

21     51.    Plaintiff served the Director of the California Department of Toxic
22 Substances Control ("DTSC") a NOTICE OF INTENT TO FILE SUIT UNDER
23 CERCLA AND THE CALIFORNIA HAZARDOUS SUBSTANCE ACCOUNT ACT
24 pursuant to Health & Safety Code § 25363, subd. (e), by mail. Furthermore upon filing,
25 plaintiff will mail a copy of this fourth amended complaint to the U.S. Attorney General
26 and the Administrator of U.S. EPA.

27 ///

28

L0455215.DOC

9

**HACLA'S [PROPOSED] FIFTH AMENDED COMPLAINT FOR COST RECOVERY, CONTRIBUTION, COMMON LAW CAUSES OF ACTION, DECLARATORY RELIEF AND NEGLIGENT MISREPRESENTATION; DEMAND FOR JURY TRIAL**

## FIRST CLAIM FOR RELIEF

(Cost Recovery under CERCLA §107(a) -- Against All Defendants

and DOES 1 through 10, Inclusive, Except 9901 Alameda LLC and John Maddux)

52.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 51, as though fully set forth.

53.     Plaintiff is informed and believes, and on that basis alleges, that defendant, PACER INTERNATIONAL, INC., defendants, and each of them, transported or arranged for transport of hazardous substances which they, and it, owned or possessed to and, or, within, the Site, and stored, treated and disposed of hazardous substances at the Site, and otherwise owned and, or, operated the Site, whether its facilities or real property, during the time that hazardous substances were disposed of at the Site, including, but not limited to, that portion of the Site leased by defendant, PACER INTERNATIONAL, INC.   Defendants, and each of them, are thereby jointly and severally liable under § 107(a) of CERCLA, 42 U.S.C.A. § 9607(a).

54.     Plaintiff is informed and believes, and on that basis alleges, that the entire Site, including, but not limited to, that portion of the Site which PACER INTERNATIONAL, INC., leased, is a facility, as that term is defined in CERCLA, 42 U.S.C.A. § 9601(9).

55.     Plaintiff is informed and believes, and on that basis alleges, that a release or threatened release of a hazardous substance, as those terms are defined in CERCLA, at title 42, §§ 9601(22) and (14), has occurred at the Site.

56.     Plaintiff did not cause or contribute to the environmental contamination at the Site.   However, in the interest of an expeditious cleanup and acting in good faith, plaintiff undertook actions including, but not limited to, investigation and characterization response actions in an effort to remove and remediate the environmental contamination at the Site.   As a result of the releases or threatened releases of hazardous substances at the Site, plaintiff has incurred necessary costs according to proof, in the

1    course of taking these actions.  These actions and the costs incurred in taking them are

2    consistent with the National Contingency Plan (hereinafter, the "NCP").

3        57.    Plaintiff will incur future costs in response to the release or threatened

4    release of hazardous substances from the Site in an amount yet undetermined but which,

5    on information and belief, it alleges will exceed $1,000,000.00.

6        58.    Defendants, and each of them, are strictly liable to plaintiff for the costs

7    referred to above and for interest on those costs pursuant to 42 U.S.C.A. § 9607(a).

8    **SECOND CLAIM FOR RELIEF**

9    (Contribution and, or, Indemnity under

10    California Health & Safety Code § 25363, subd. (e) -- Against All Defendants

11    and DOES 1 through 10, Inclusive, Except 9901 Alameda LLC and John Maddux)

12        59.    Plaintiff repeats and realleges each and every allegation contained in

13    paragraphs 1 through 58, as though fully set forth.

14        60.    Plaintiff is informed and believes, and on that basis alleges, that defendants,

15    and each of them, are liable persons as defined by Health & Safety Code § 25323.5, and

16    are thereby liable in contribution and, or, indemnity for response costs pursuant to Health

17    & Safety Code § 25363, subd. (e).

18        61.    Plaintiff did not cause or contribute to the environmental contamination at

19    the Site.  However, in the interest of an expeditious cleanup and acting in good faith,

20    plaintiff has incurred costs necessary to respond to the release or threatened release of

21    hazardous substances from the Site consistent with the NCP in an amount to be proved at

22    trial.

23        62.    Plaintiff will incur future costs in response to the release or threatened

24    release of hazardous substances from the Site in an amount yet undetermined but which,

25    on information and belief, it alleges will exceed $1,000,000.00.

26    ///

27    ///

28    L0455215.DOC

63.     Defendants, and each of them, are liable to plaintiff for contribution and, or, indemnity under Health & Safety Code §§ 25363, subd. (e), and 25323.5, for some or all amounts that plaintiff has incurred and may, in the future, incur as the result of the release or threatened release of hazardous substances from the Site.

### THIRD CLAIM FOR RELIEF

(Private Nuisance – Against All Defendants

and DOES 1 through 10, Inclusive, Except 9901 Alameda LLC and John Maddux)

(California *Civil Code* § 3479)

64.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63, as though fully set forth.

65.     The release, and ongoing and continuous presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site constitutes a nuisance, which has and continues to unreasonably and substantially interfere with plaintiff's comfortable enjoyment of the Site by being injurious to health, indecent or offensive to the senses and an obstruction to the free use of the Site.

66.     Plaintiff does not consent to the nuisance and it is informed and believes, and upon that information and belief, alleges that, defendants, and each of them, know or should have known that plaintiff does not consent to the nuisance.

67.     The release, and ongoing and continuous presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site constitutes a continuing nuisance in that the impact to the Site from the hazardous substances and petroleum hydrocarbons continues at concentrations above those allowed by law.

68.     The release, and ongoing and continuous presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site, which was caused and, or, maintained, by the negligent acts, or omissions, of defendants, and each of them, is an unlawful invasion of plaintiff's interests.

///

69.    Defendants have failed to abate the presence of hazardous substances and petroleum hydrocarbons on and beneath the Site despite the fact that they, and it, could have done so at any time during their, and its, possession of the Site and, or, could still otherwise do so and despite the abatable nature of the nuisance and the reasonable cost to accomplish abatement of such nuisance.

70.    Plaintiff is informed and believes, and upon that information and belief alleges, that reduction of the concentration of hazardous substances and petroleum hydrocarbons on and beneath the Site to levels acceptable to the DTSC and, or, other appropriate federal, state and/or local government regulatory agencies is sufficient abatement.

71.    Plaintiff has suffered damages due to the former, and ongoing and continuous, nuisance, which has and continues to unreasonably and substantially interfere with plaintiff's comfortable enjoyment of the Site, in an amount to be proved at trial.

72.    Plaintiff will incur future damages as a result of the former, and ongoing and continuous, nuisance in an amount yet undetermined but which, on information and belief, it alleges will exceed $1,000,000.00.

## FOURTH CLAIM FOR RELIEF

(Trespass -- Against All Defendants

and DOES 1 through 10, Inclusive, Except 9901 Alameda LLC and John Maddux)

73.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 72, as though fully set forth.

74.    The release, and ongoing and continuous presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site constitutes a trespass, which was and continues to be an unlawful interference with plaintiff's possessory interests in the Site.

///

///

L0455215.DOC

13

75.   Plaintiff does not consent to the trespass and plaintiff is informed and believes, and upon that information and belief, alleges that, defendants, and each of them, know or should have known that plaintiff does not consent to the trespass.

76.   Defendants, and each of them, by their negligent and, or, intentional acts and, or, omissions, caused and, or, permitted the release, and ongoing and continuous presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site.

77.   Plaintiff is informed and believes, and upon that information and belief alleges, that defendants, and each of them, knew or should have known that the release of hazardous substances and petroleum hydrocarbons would result in the entry of foreign matter on and beneath the Site.

78.   The Site has been, and continues to be, physically injured by the presence of hazardous substances and petroleum hydrocarbons on and beneath the Site.

79.   Defendants have failed to abate the presence of hazardous substances and petroleum hydrocarbons on and beneath the Site despite the fact that they, and it, could do so at any time and despite the abatable nature of the trespass and the reasonable cost to accomplish abatement of such trespass.

80.   Plaintiff is informed and believes, and upon that information and belief, alleges that, reduction of the concentration of hazardous substances and petroleum hydrocarbons on and beneath the Site to levels acceptable to the DTSC and, or, other appropriate federal, state and/or local government regulatory agencies is sufficient abatement of the trespass.

81.   Plaintiff has suffered damages due to the former, and ongoing and continuous trespass, which has and continues to unreasonably and substantially interfere with plaintiff's possessory interests in the Site, in an amount to be proved at trial.

82.   Plaintiff will incur future damages as a result of the former, and ongoing and continuous, trespass in an amount yet undetermined but which, on information and belief, it alleges will exceed $1,000,000.00.

L0455215.DOC

14

**FIFTH CLAIM FOR RELIEF**

(Negligence -- Against Defendants, Becker Bros. Steel Supply Co., Shama, a General Partnership, Shama, LLC,

and DOES 1 through 10, Inclusive)

83.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 82, as though fully set forth.

84.   Defendants, Becker Bros. Steel Supply Co., Shama, a General Partnership, Shama, LLC, and Does 1 through 10, owed plaintiff a reasonable duty of care to protect it against the unlawful release and presence of hazardous substances and petroleum hydrocarbons on and beneath the Site.

85.   Plaintiff is informed and believes, and upon that information and belief, alleges that, defendants, Becker Bros. Steel Supply Co., Shama, a General Partnership, Shama, LLC, and Does 1 through 10, owned and/or operated the Site within less than three years of the filing of this lawsuit.

86.   Plaintiff is informed and believes, and upon that information and belief, alleges that, defendants, Becker Bros. Steel Supply Co., Shama, a General Partnership, Shama, LLC, and Does 1 through 10, breached the duty of care owed to plaintiff and were negligent in allowing the release and presence of hazardous substances and petroleum hydrocarbons on and beneath the Site.

87.   Plaintiff is informed and believes, and upon that information and belief, alleges that, the negligence of defendants, Becker Bros. Steel Supply Co., Shama, a General Partnership, Shama, LLC, and Does 1 through 10, was the proximate cause of injury to the Site, namely the release and presence of hazardous substances and petroleum hydrocarbons above concentrations acceptable to the DTSC and, or, other appropriate federal, state and/or local government regulatory agencies, and the resulting damages incurred by plaintiff.

///

88.    Plaintiff has suffered damages due to the former release, and ongoing and continuous unlawful presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site, in an amount to be proved at trial.

89.    Plaintiff will incur future damages due to the former release, and ongoing and continuous unlawful presence, of hazardous substances and petroleum hydrocarbons on and beneath the Site in an amount yet undetermined but which, on information and belief, it alleges will exceed $1,000,000.00.

## SIXTH CLAIM FOR RELIEF

(Declaratory Relief — Against All Defendants

and DOES 1 through 10, Inclusive, Except 9901 Alameda LLC and John Maddux)

90.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89, as though fully set forth.

91.    An actual controversy now exists between plaintiff and defendants, and each of them, in that plaintiff contends that defendants, and each of them, are liable to plaintiff for cost recovery under CERCLA § 107(a), contribution and/or indemnity under Health & Safety Code § 25363, subd. (e), and for damages under the California causes of action for nuisance, trespass and negligence for any response or other costs or damages which plaintiff has incurred or may incur or be found liable for in connection with the unlawful presence of hazardous substances and petroleum hydrocarbons on and beneath the Site.  Plaintiff believes that defendants, and each of them, contend in all respects to the contrary.

92.    A declaration of the rights and obligations of the parties pursuant to 42 U.S.C.A. § 9613(g)(2), and 28 U.S.C.A. § 2201, binding in any subsequent action or actions to recover all further response costs and damages incurred by plaintiff, is appropriate and in the interest of justice in that an early determination of this controversy will avoid a multiplicity of litigation.

## SEVENTH CLAIM FOR RELIEF

(Negligent Misrepresentation against John Maddux and 9901 Alameda LLC)

93.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 92, as though fully set forth.

94.   9901 Alameda LLC is, and at all times relevant to this action was, a California limited liability company authorized to do business in California.

95.   John Maddux ("Maddux") was at all times relevant to this action an individual residing and doing business in Los Angeles, California, and a principal and managing member of 9901 Alameda LLC, and at all relevant times was acting as the agent of 9901 Alameda LLC.

96.   On or about March 26, 2008, in connection with the sale of the Property from 9901 Alameda LLC to HACLA, Maddux and 9901 Alameda LLC represented to HACLA that the only documents in 9901 Alameda LLC's possession regarding the environmental condition of the Property were the following:  Phase I Environmental Site Assessment dated August 24, 2004, by Environmental Geoscience Services; Phase I Environmental Site Assessment and Selected Soil Sampling dated February 9, 1996, by The Mark Group, Inc.; Phase II Environmental Site Assessment Report, dated September 16, 2005, by RCC Group, LLC; and a Letter from Clean Harbors Environmental Services regarding a Budgetary Estimate – Remedial Activities at 9901 South Alameda Street Property.   These documents were listed and defined in the Purchase and Sale Agreement between 9901 Alameda LLC and HACLA as a part of "the Property Documents."

97.   In Section 5.1.4 of the Purchase and Sale Agreement for 9901 South Alameda Street, a true and correct copy of which is attached hereto as Exhibit "A," Maddux and 9901 Alameda LLC represented that "[t]he Property Documents are all of the reports, data, studies and other due diligence materials concerning the Property in Seller's possession.  Without limiting the foregoing, Seller does not have any reports or

L0455215.DOC

17

studies concerning the environmental condition of the Property other than those included in the Property Documents."

98.   The representation described in Paragraph 97 above was untrue, and Maddux and 9901 Alameda LLC made this representation without any reasonable ground for believing it to be true.

99.   In fact, 9901 Alameda LLC was in possession of documents prepared by Environmental Geoscience Services, an environmental consulting firm that described the results of significant environmental testing and analysis on the Property.   These documents included: (i)   analytical reports from Chemical & Environmental Laboratories, Inc.; (ii) Maps of the Property showing the estimated areas of total petroleum hydrocarbon contamination, PCB contamination, and metals contamination; and (iii) a preliminary cost estimate for remediation of contamination at the Property of up to $3 million.  None of these documents were provided to HACLA at the time of the purchase and sale and their existence was not known or discovered by HACLA until the production and review of documents in the course of this litigation.  The discovery of those documents by HACLA occurred within two years prior to the filing of this Fifth Amended Complaint.

100.  At the time HACLA entered into the Purchase and Sale Agreement, it did not know that Maddux and 9901 Alameda LLC's representation regarding the totality of the documents describing the environmental condition of the Property in their possession was untrue and reasonably believed it to be true.

101.  Maddux and 9901 Alameda LLC made the representation regarding the totality of the documents in their possession describing the environmental condition of the Property for the purpose of inducing HACLA to execute and perform the Purchase and Sale Agreement.

102.  At the time HACLA entered into the Purchase and Sale Agreement, it did not know that Maddux and 9901 Alameda LLC's representation regarding the totality of

HACLA'S [PROPOSED] FIFTH AMENDED COMPLAINT FOR COST RECOVERY, CONTRIBUTION, COMMON LAW CAUSES OF ACTION, DECLARATORY RELIEF AND NEGLIGENT MISREPRESENTATION; DEMAND FOR JURY TRIAL

the documents describing the environmental condition of the Property in their possession was untrue and reasonably believed it to be true.

103.   HACLA acted in justifiable reliance upon the truth of the representation of Maddux and 9901 Alameda LLC by entering into and performing the Purchase and Sale Agreement.   Had HACLA known about the other documents in Maddux and 9901 Alameda LLC's possession describing the environmental condition of the Property, HACLA would not have entered into the Purchase and Sale Agreement for $31.2 million.

104.   As a result of HACLA's justifiable reliance on the representation of Maddux and 9901 Alameda LLC, HACLA has been damaged by an amount according to proof and in excess of $2 million.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests judgment against defendants as follows:

1.   For all response costs and other costs incurred by plaintiff in connection with the unlawful presence of hazardous substances and petroleum hydrocarbons on and beneath the Site, according to proof and interest on those costs;

2.   For a judicial declaration that defendants, and each of them, are liable to plaintiff under CERCLA § 107(a) and Health & Safety Code § 25323.5, are liable to plaintiff in contribution and/or indemnity under Health & Safety Code § 25363, subd. (e), and are liable for damages under the California causes of action for nuisance, trespass and negligence for all past, present and future response costs and other costs which may be incurred by plaintiff in connection with the unlawful presence of hazardous substances and petroleum hydrocarbons on and beneath the Site;

3.   For compensatory damages, according to proof;

4.   For plaintiff's costs of litigation; and

///

L0455215.DOC                                    19

**HACLA'S [PROPOSED] FIFTH AMENDED COMPLAINT FOR COST RECOVERY, CONTRIBUTION, COMMON LAW CAUSES OF ACTION, DECLARATORY RELIEF AND NEGLIGENT MISREPRESENTATION; DEMAND FOR JURY TRIAL**

5.    For such other and further relief as the court deems just and proper.

Dated:  October 4, 2013

**MORRIS POLICH & PURDY LLP**

By:  _____

Walter J. Lipsman
Christopher G. Foster
Richard E. Stultz
Sudhir Lay Burgaard
Attorneys for Plaintiff,
**HOUSING AUTHORITY OF
THE CITY OF LOS ANGELES**

## DEMAND FOR JURY TRIAL

Plaintiff, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, demands a jury trial on its Third (Private Nuisance), Fourth (Trespass) and Fifth (Negligence) Claims for Relief asserted in its complaint herein.

Dated:  October 4, 2013

**MORRIS POLICH & PURDY LLP**

By:  _____

Walter J. Lipsman
Christopher G. Foster
Richard E. Stultz
Sudhir Lay Burgaard
Attorneys for Plaintiff,
**HOUSING AUTHORITY OF
THE CITY OF LOS ANGELES**

L0455215.DOC

20

# Exhibit "A"

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS
### (9901 South Alameda Street)

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") is made as of March 26, 2008 by and between 9901 ALAMEDA, LLC, a California limited liability company ("Seller"), and the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Buyer"), with reference to the following facts:

### RECITALS

A.     Seller has entered into a purchase and sale agreement (the "Master Purchase Agreement") pursuant to which Seller has the right and obligation to purchase the Property (as defined below), which consists of the improved real property commonly known as 9901 South Alameda Street in an unincorporated portion of Los Angeles County, California and certain related personal property, if any.

B.     Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, subject to and following Seller's purchase of the Property pursuant to the Master Purchase Agreement, the Property upon the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, with reference the foregoing Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1 - BASIC TERMS

This Article 1 sets forth certain terms of this Agreement, subject, however, to any adjustments set forth elsewhere in this Agreement.

1.1     Purchase Price:  Thirty-One Million Two Hundred Thousand Dollars ($31,200,000).

1.2     Closing Date:  March 31, 2008.

1.3     Escrow Holder:  Commerce Escrow Company.

1.4     Title Company:  Chicago Title Insurance Company.

### ARTICLE 2 - SALE OF THE PROPERTY

Upon the terms and conditions set forth in this Agreement, Seller agrees to sell, assign and convey to Buyer, and Buyer agrees to purchase from Seller, the following (collectively, the "Property"):

20893995

HACLA 002277

**2.1** **Real Property.** That certain land located in the County of Los Angeles, State of California more particularly described on Exhibit A (the "Land"), together with all improvements located thereon (the "Improvements"), and all rights, privileges, easements and appurtenances to the Land, if any (the Land, the Improvements and all such rights, privileges, easements and appurtenances are referred to collectively herein as the "Real Property").

**2.2** **Lease.** All of Seller's interest as lessor under the lease identified on Exhibit B (the "Lease") and any and all guaranties and security instruments relating thereto, including those listed on Exhibit B.

**2.3** **Personal Property.** Any and all tangible personal property owned by Seller that is located on the Land and/or the Improvements as of the Closing and used exclusively in the operation or maintenance of the Land and/or the Improvements (collectively, the "Personal Property"), if any.

**2.4.** **Intangible Property.** All of Seller's interest in any and all licenses, approvals, certificates, permits, warranties, guaranties, indemnities and claims that relate to the Real Property, the Master Purchase Agreement and/or the Personal Property or any portion thereof (collectively, the "Intangible Property").

## ARTICLE 3 - CONSIDERATION

The consideration for the sale of the Property shall be (i) the payment to Seller of the amount specified in Paragraph 1.1 (the "Purchase Price"), subject to the prorations and adjustments provided in this Agreement, and (ii) the grant of an option by Buyer to Seller to repurchase a portion, but not all, of the Property, upon the terms and subject to the conditions contained in the Option Agreement attached as Exhibit C (the "Option Agreement").

## ARTICLE 4 - BUYER'S DUE DILIGENCE; AS-IS PURCHASE

**4.1** **Property Documents.** Seller has provided Buyer with copies (or, at Seller's election, the originals) of the reports, data, documents and other materials listed on Exhibit D (collectively, the "Property Documents").

**4.2** **Access.** Buyer acknowledges that Seller does not currently own the Real Property and, as such, Seller cannot assure Buyer that Buyer may access the Real Property prior to Closing for due diligence purposes prior to the Closing. However, commencing on the date of this Agreement and continuing until the Closing or any earlier termination of this Agreement, Seller shall use commercially reasonable efforts to allow Buyer and its authorized agents and representatives to enter upon the Real Property for the purpose of conducting Buyer's due diligence with respect to its purchase of the Property.

**4.2.1** **Conditions to Entry.** Neither Buyer nor its agents and representatives may enter upon the Real Property for the purpose of inspecting or testing any portion thereof or for any other reason without having given Seller notice of its intention to enter the Real Property at least one (1) day before such entry. Seller may impose reasonable conditions and restrictions on Buyer's right to enter the Real Property

2089399-5

2

HACLA 002278

**96**

under this Agreement (taking into account the terms of Seller's access rights) and Buyer agrees to comply with any such conditions and restrictions in exercising its rights hereunder. In no event may Buyer drill or bore on or through the surface of the Land or conduct any other invasive testing of the Property without first obtaining the written consent thereto of Seller, which consent shall not be unreasonably withheld (Buyer acknowledges that Seller may not grant such consent without the approval of the seller under the Master Purchase Agreement). After making any tests and inspections, Buyer shall promptly restore the Real Property to its condition prior to such tests and inspections (which obligation shall survive the Closing or any termination of this Agreement) to the extent required under the Master Purchase Agreement.

4.2.2   Indemnification. Buyer shall keep the Property free from all liens and indemnify, defend and hold harmless Seller and Seller's officers, directors, shareholders, beneficiaries, members, partners, affiliates, agents, employees and attorneys, and their respective successors and assigns, from and against all claims, actions, losses, liabilities, damages, costs and expenses (including attorneys' fees and costs) incurred by or claimed against Seller by reason of any damage to the Real Property or injury to persons (including Buyer's employees) caused by Buyer and/or its agents, employees or contractors in connection with their entry upon the Property and/or the performance of any inspections, tests or other due diligence related thereto. This indemnity shall survive the Closing or any termination of this Agreement.

4.3   AS-IS. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS" BASIS AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN PARAGRAPH 5.1, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING: (*i*) the quality, nature, adequacy and physical condition and aspects of the Property, (*ii*) the existence, quality, nature, adequacy and physical condition of utilities serving the Real Property, (*iii*) the development potential of the Real Property, and the Real Property's and Personal Property's use, habitability, merchantability or fitness, or the suitability, value or adequacy of the Real Property and the Personal Property for any particular purpose, (*iv*) the zoning or other legal status of the Real Property or any other public or private restrictions on use of the Real Property, (*v*) the compliance of the Real Property and the Personal Property with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental authority or of any other person or entity, (*vi*) the presence of hazardous materials on, under or about the Real Property, (*vii*) the quality of any labor and materials used in the Improvements, (*viii*) the condition of title to the Property, (*ix*) the condition of the Personal Property, (*x*) the Lease or other agreements affecting the Property, and (*xi*) the economics of the operation of the Property.

4.4   Hazardous Substances Disclosure. Without limiting Paragraph 4.3, pursuant to California Health and Safety Code Section 25359.7, Seller hereby notifies and informs Buyer that a release of hazardous substance (as said term is used in said code section) has come to be located on or beneath the Real Property, as more particularly provided in the environmental reports included in the Property Documents.

20289399-5

HACLA 002279

4.5 Release. Effective as of the Closing, except for any claims, demands, causes of action, obligations, losses, damages, penalties, costs, fees and expenses (collectively, "Claims") arising out of (i) a breach by Seller of any of Seller's representations and warranties in Paragraph 5.1, Seller's covenants in Article 9 or any representations, warranties or covenants in any documents executed by Seller in favor of Buyer pursuant to this Agreement that is discovered by Buyer after the Closing, and (ii) a default by Seller after the Closing under those provisions of this Agreement that are expressly stated to survive the Closing or under any documents executed by Seller in favor of Buyer pursuant to this Agreement at or in connection with the Closing, Buyer, on behalf of itself and its successors and assigns, waives its right to recover from, and forever releases and discharges Seller and each of Seller's affiliates, each direct and indirect member, partner or other equity owner of Seller and Seller's affiliates and their respective managers, members, partners, officers, directors, shareholders, employees, attorneys, representatives and agents, from any and all Claims, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or are in any way connected with the Property, including the physical, environmental and structural condition of the Property or any law or regulation applicable thereto and specifically including any and all Claims relating to the release, presence, discovery or removal of hazardous materials at the Real Property. With respect to the waiver and release set forth herein relating to unknown and unsuspected claims, such waiver is made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Buyer acknowledges, stipulates and agrees that this Paragraph 4.5 is a material factor in Seller's decision to enter into this Agreement and to sell the Property to Buyer for the Purchase Price. This Paragraph 4.5 shall survive the Closing.

## ARTICLE 5 – REPRESENTATIONS AND WARRANTIES

5.1 Representations and Warranties of Seller. Seller represents and warrants to Buyer that the following statements are true and correct as of the execution of this Agreement and will also be true and correct as of the Closing:

5.1.1 Good Standing. Seller is duly formed, validly existing and in good standing under the laws of the State of California.

5.1.2 Authorization and Validity. This Agreement is, and all of the documents executed by Seller which are to be delivered to Buyer at the Closing will be, duly authorized, executed, and delivered by Seller, and is and will be legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their

4

HACLA 002280

respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and does not and will not violate any provisions of any agreement to which Seller is a party or to which it is subject.

5.1.3   No Bankruptcy Proceedings.  Seller has not (*i*) made a general assignment for the benefit of creditors, (*ii*) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (*iii*) suffered the appointment of a receiver to take possession of all or substantially all of Seller's assets, or (*iv*) suffered the attachment or other judicial seizure of all or substantially all of Seller's assets.

5.1.4   Property Documents.  The Property Documents are all of the reports, data, studies and other due diligence materials concerning the Property in Seller's possession.  Without limiting the foregoing, Seller does not have any reports or studies concerning the environmental condition of the Property other than those included in the Property Documents.

5.1.5   Lease and Other Agreements.  To Seller's Knowledge, (*i*) the Lease (as described on Exhibit B) constitutes the entire agreement between the current owner of the Property and the tenant thereunder with respect to the Property, and (*ii*) except for the Lease, there are no leases or similar agreements that affect the Land and/or the Improvements and will survive the Closing.

5.1.6   No Litigation.  To Seller's Knowledge, there are no litigation or other proceedings that would (*i*) result in a judgment or other lien against the Property, (*ii*) otherwise adversely affect the use or occupancy of the Property, or (*iii*) adversely affect the ability of Seller to perform its obligations under this Agreement.

5.2   Representations and Warranties of Buyer.  Buyer represents and warrants to Seller that, as of the execution of this Agreement and as of the Closing, this Agreement is, and all of the documents executed by Buyer which are to be delivered to Seller at the Closing will be, duly authorized, executed, and delivered by Buyer, and is and will be legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and does not and will not violate any provisions of any agreement to which Buyer is a party or to which it is subject.

5.3   Definition of Seller's Knowledge.  All references in this Agreement to the phrase "Seller's Knowledge" or words of similar import shall refer only to the actual knowledge of Todd W. Nielsen (the "Designated Employee") and shall not be construed to refer to the knowledge of any other officer, manager, agent or employee of Seller.  There shall be no personal liability on the part of the Designated Employee arising out of any representations or warranties made herein.

2089359-5

5

HACLA 002281

99

5.4    Survival of Seller's Representations.  The representations and warranties made by Seller in this Agreement shall survive the Closing and not be merged therein for a period of one (1) year and Seller shall only be liable to Buyer hereunder for a breach of a representation and warranty made in this Agreement with respect to which a claim is made by Buyer against Seller on or before one (1) year after the date of the Closing.

## ARTICLE 6 - CONDITIONS TO CLOSING

Conditions to Buyer's Obligations.  Buyer's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions (the "Buyer's Conditions Precedent"):

6.1.1.   Master Purchase Agreement Closing.  Seller shall have acquired the Property pursuant to the Master Purchase Agreement.

6.1.2.   Title Policy.  The title insurance company specified in Paragraph 1.4 (the "Title Company") shall have committed to issue, at the Closing, an Owner's Policy of Title Insurance to Buyer in this form of, and without any exceptions to coverage other than those contained in, the pro forma title insurance policy attached as Exhibit F (the "Title Policy").

6.1.3.   No Breaches.  Seller shall have timely delivered the items described in Paragraph 7.3 as provided therein and Seller shall not have materially breached any of Seller's other covenants set forth in this Agreement as of the Closing.

6.1.4.   Accuracy of Representations and Warranties.  None of Seller's representations and warranties in Paragraph 5.1 shall be untrue or inaccurate in any material respect as of the Closing.

The Buyer's Conditions Precedent are solely for the benefit of Buyer and may be waived only by Buyer. Buyer shall not act or fail to act for the purpose of permitting or causing any of the Buyer's Conditions Precedent to be satisfied as of the Closing Date.  If a Buyer's Condition Precedent is not satisfied on the Closing Date, then Buyer may, at its sole option (i) waive the unsatisfied condition and proceed to close the transaction without any reduction in the Purchase Price, (ii) terminate this Agreement by delivering written notice thereof to Seller and Escrow Holder, or (iii) if the Master Purchase Agreement remains in effect, extend the Closing Date in accordance with the applicable closing date under the Master Purchase Agreement.

6.2.    Conditions to Seller's Obligations.  Seller's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction of the following conditions (the "Seller's Conditions Precedent"):

6.2.1.   Master Agreement Closing.  Seller shall have acquired the Property pursuant to the Master Purchase Agreement.

6.2.2.   No Breaches.  Buyer shall have timely delivered the items described in Paragraph 7.3 as provided therein and Buyer shall not have materially breached any of Buyer's other covenants set forth in this Agreement as of the Closing.

6

HACLA 002282

6.2.3 Accuracy of Representations and Warranties. None of Buyer's representations and warranties in Paragraph 5.2 shall be untrue or inaccurate in any material respect as of the Closing.

The Seller's Conditions Precedent are solely for the benefit of Seller and may be waived only by Seller. Seller shall not act or fail to act for the purpose of permitting or causing any of the Seller's Conditions Precedent to be unsatisfied as of the Closing Date. If a Seller's Condition Precedent is not satisfied on the Closing Date, then Seller may (i) waive the unsatisfied condition and proceed to close the transaction, or (ii) terminate this Agreement by delivering written notice thereof to Buyer; provided, however, that Seller may not terminate this Agreement if the failed condition is the one set forth in Paragraph 6.2.1 and the Master Purchase Agreement remains in effect, and in such event the Closing Date shall be extended in accordance with any extension of the closing date under the Master Purchase Agreement.

## ARTICLE 7- ESCROW AND CLOSING

7.1  Opening of Escrow. Buyer and Seller have selected Escrow Holder to act as the escrow holder with respect to the transaction contemplated by this Agreement. Within one (1) business day after execution of this Agreement, Buyer and Seller each shall deposit a duplicate original of this Agreement executed by such party (or either of them shall deposit a duplicate original executed by both Buyer and Seller) with Escrow Holder. This Agreement, together with such further instructions, if any, as the parties shall provide to Escrow Holder by written agreement, shall constitute the escrow instructions with respect to the escrow for the transaction contemplated by this Agreement (the "Escrow"). If any requirements relating to the duties or obligations of Escrow Holder hereunder are not acceptable to Escrow Holder, or if Escrow Holder requires additional instructions, the parties agree to make such deletions, substitutions and additions hereto as counsel for Buyer and Seller shall mutually approve, which additional instructions shall not substantially alter the terms of this Agreement unless otherwise expressly agreed to by Seller and Buyer.

7.2  Closing Date. Subject to any rights of either party to extend the closing as expressly provided elsewhere in this Agreement, the purchase and sale transaction contemplated by this Agreement shall close on the date specified in Paragraph 1.2 (the "Closing Date"). For purposes of this Agreement, the "Closing" shall be deemed to occur as of the date and time that the Deed is recorded in the Official Records of Los Angeles County.

7.3  Seller's Deliveries to Escrow. At least one (1) business day prior to the Closing Date, Seller shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

7.3.1  Deed. One (1) original grant deed in the form of Exhibit F executed by Seller and acknowledged by a notary (the "Deed").

7.3.2  Bill of Sale and Assignment. One (1) original Bill of Sale and Assignment in the form of Exhibit G executed by Seller (the "Bill of Sale and Assignment").

Z089399-5

7

HACLA 002283

**7.3.3** <u>Assignment of Lease</u> . Two (2) originals of an Assignment and Assumption Agreement in the form of <u>Exhibit H</u> executed by Seller (the "Assignment of Lease").

**7.3.4** <u>Certificate of Non-Foreign Status</u>. One (1) original affidavit in the form of <u>Exhibit I</u> and one (1) original California Form 593-W, each executed by Seller (collectively, the "Certificate of Non-Foreign Status").

**7.3.5** <u>Option Agreement</u>. Two (2) originals of the Option Agreement executed by Seller.

**7.3.6** <u>Memorandum</u> . Two (2) originals of a Memorandum of Option Agreement in the form of <u>Exhibit J</u> executed by Seller and acknowledged by a notary (the "Memorandum").

**7.3.7** <u>Organizational and Authority Documents</u>. Copies of Seller's LLC-1 and operating agreement (and any amendments thereto), and a resolution or unanimous written consent authorizing the sale of the Property as provided in this Agreement.

**7.3.8** <u>Title Company Requirements</u>. Such documents and instruments as the Title Company may require to issue the Title Policy.

**7.3.9** <u>Other Documents</u>. Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

**7.4** <u>Buyer's Deliveries to Escrow</u>. At least one (1) business day prior to the Closing Date, Buyer shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

**7.4.1** <u>Funds</u>. The Purchase Price, together with such other sums as Escrow Holder shall require to pay Buyer's share of the closing costs, prorations, reimbursements and adjustments as set forth in <u>Article 8</u>, in immediately available funds ("Buyer's Funds").

**7.4.2** <u>Assignment of Lease</u>. Two (2) originals of the Assignment of Lease executed by Buyer.

**7.4.3** <u>Option Agreement</u> . Two (2) originals of the Option Agreement executed by Buyer.

**7.4.4** <u>Memorandum</u>. Two (2) originals of the Memorandum executed by Buyer and acknowledge by a notary.

**7.4.5** <u>Title Company Requirements</u>. Such documents and instruments as the Title Company may require to issue the Title Policy.

8

2029399-5

HACLA 002284

**102**

7.4.6   Other Documents. Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

7.5     Escrow for Master Purchase Agreement. It is anticipated that Seller will close its purchase of the Property under the Master Purchase Agreement immediately prior to the Closing, and Seller intends to use a portion of the funds representing the Purchase Price to pay the purchase price under the Master Purchase Agreement. Accordingly, provided that (i) all documents required to close Seller's purchase of the Property under the Master Purchase Agreement have been deposited into the applicable escrow with Escrow Holder (the "Master Purchase Agreement Escrow"), (ii) all closing conditions under the Master Purchase Agreement and the Master Purchase Agreement Escrow (other than the deposit of the balance of the purchase price by Seller) have been satisfied and Escrow Holder is prepared to close the Master Purchase Agreement Escrow and record the deed to Seller, (iii) Seller has delivered each of the documents and other items required under Paragraph 7.3 and authorized Escrow Holder to close the Escrow, and (iv) Escrow Holder has not received written notice of the failure of any Buyer's Condition Precedent, then Escrow Holder may, on the business day immediately prior to the Closing Date, transfer from the Escrow to the Master Purchase Agreement Escrow such portion of Buyer's Funds as is necessary for Seller to pay the balance of the purchase price under the Master Purchase Agreement and Seller's share of any closing costs.

7.6     Disbursements and Other Actions by Escrow Holder. Upon the Closing, Escrow Holder shall promptly undertake all of the following:

7.6.1   Recordation of Deed. Cause the Deed, the Memorandum and any other documents which the parties hereto may mutually direct to be recorded in the Official Records of Los Angeles County and obtain conformed copies thereof for distribution to Buyer and Seller.

7.6.2   Calculation and Disbursement. Disburse the remainder of Buyer's Funds as follows:

(a)     first, deduct all items chargeable to the account of Seller pursuant to Article 8;

(b)     next, disburse the balance of the Purchase Price (i.e., the Purchase Price minus the amount of Buyer's Funds transferred to the Master Purchase Agreement Escrow as provided in Paragraph 7.5) and any additional amounts owed to Seller under this Agreement to or as directed by Seller promptly upon the Closing by wire transfer in accordance with instructions received from Seller; and

(c)     next, disburse the remaining balance of Buyer's Funds, if any, to or as directed by Buyer promptly upon the Closing by wire transfer in accordance with instructions received from Buyer.

7.6.3   Title Policy. Direct the Title Company to issue the Title Policy to Buyer.

9

HACLA 002285

**7.6.4** Deliveries to Seller. Deliver to Seller: a copy of the Bill of Sale and Assignment; one (1) original Assignment of Lease; one (1) original Option Agreement; and a conformed copies of the recorded Deed and Memorandum.

**7.6.5** Deliveries to Buyer. Deliver to Buyer: the original Bill of Sale and Assignment; one (1) original Assignment of Lease; the original Certificate of Non-Foreign Status; one (1) original Option Agreement; conformed copies of the recorded Deed and Memorandum; copies of Seller's LLC-1 and operating agreement and the authorizing resolution or consent.

**7.7** Deliveries By Seller to Buyer Upon Closing. Seller shall deliver the following items to Buyer upon the Closing:

**7.7.1** Property Documents. Originals of all Property Documents in Seller's possession.

**7.7.2** Keys. All keys in Seller's possession to all entrance doors to the Improvements.

**7.7.3** Tenant Notice. A notice to the tenant of the Property informing the tenant of the sale to Buyer, that the tenant's security deposit, if any, has been transferred to Buyer and the address to which future rent payments should be sent.

**7.8** Real Estate Reporting Person. Escrow Holder is designated the "real estate reporting person" for purposes of section 6045 of title 26 of the United States Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Holder shall so provide. Upon the consummation of the transaction contemplated by this Agreement, Escrow Holder shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.

## ARTICLE 8 - ADJUSTMENTS AND PRORATIONS

**8.1** Prorations. The following shall be prorated and adjusted between Seller and Buyer as of the day of the Closing, except as otherwise specified:

**8.1.1** Taxes. Non-delinquent taxes, including general real estate taxes, supplemental taxes and special assessments, and any improvement or other bonds affecting the Property, based upon the most recently available real estate or property tax information.

**8.1.2** Rents. Rents and other charges under the Lease to the extent such monies have actually been collected by Seller. Rents and other charges under the Lease that are delinquent as of the Closing shall not be prorated, and rents and other amounts received by Buyer after the Closing from the tenant owing such delinquent rent or other charges shall be applied as set forth in Paragraph 8.5.

**8.1.3** Other Revenues. Other revenues from the operation of the Property (i.e., other than rents and other charges under the Lease), if any.

HACLA 002286

8.1.4   Utilities.  Charges for water, gas, electricity, telephone, sewer and other utilities (other than such charges which are the obligations of the tenant to pay to the provider of such utility).

8.1.5   Other Items.  Such other items as are customarily prorated in a transaction of this nature.

For purposes of calculating prorations, Buyer shall be deemed to be in title to the Property, and, therefore, entitled to the income therefrom and, except as otherwise provided in this Agreement, responsible for the expenses thereof for the entire day upon which the Closing occurs. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty-five (365) day year. The amount of such prorations shall be initially performed by Seller and Buyer at Closing based on information then available, but shall be subject to adjustment in cash after the Closing outside of escrow as and when complete and accurate information becomes available, if such information is not available at the Closing. This Paragraph 8.1 shall survive the Closing.

8.2   Security Deposit.  Buyer shall receive a credit against the Purchase Price equal to the amount of any unapplied security deposit under the Lease.

8.3   Closing Costs.  Seller shall pay (i) the premium for the "CLTA" or "standard" coverage portion of the Title Policy, (ii) all of the documentary transfer tax imposed in connection with the sale of the Property, if any, and (iii) the recording fees for the Memorandum, if any, and (iv) one-half (½) of the fees and costs imposed by Escrow Holder. Buyer shall pay (i) the portion of the premium for the Title Policy attributable to the "extended coverage" and any endorsements thereto, (ii) the recording fees for the Deed, if any, and (iii) one-half (½) of the fees and costs of Escrow Holder.

8.4   Cancellation Fees.  If the sale of the Property contemplated hereunder does not occur because of a default on the part of Buyer, all escrow and title cancellation fees shall be paid by Buyer, and if the sale of the Property does not occur because of a default on the part of Seller, all escrow and title cancellation fees shall be paid by Seller. In all other cases, all escrow and title cancellation fees shall be shared equally by the parties.

8.5   Delinquent Rents.  If, as of the Closing, the tenant is in arrears in the payment of rent or has not paid the rent payable by it for the month in which the Closing occurs (whether or not it is in arrears for such month as of the Closing), then (i) Buyer shall use reasonable and diligent efforts to collect such amounts after the Closing and shall keep Seller reasonably informed of its collection efforts, and (ii) any rents received by Buyer or Seller from the tenant after the Closing shall be applied to amounts due and payable during the following periods in the following order of priority: (a) first, to the month in which the Closing occurred; (b) second, to the months following the month in which the Closing occurred; and (c) thereafter, to the months preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Buyer after the Closing are due and payable to the other party by reason of this allocation, the appropriate sum shall be promptly paid to the other party. This Paragraph 8.5 shall survive the Closing.

HACLA 002287

**105**

## ARTICLE 9 - COVENANTS

9.1     Master Purchase Agreement. Seller shall perform all of its obligations under, and use commercially reasonable efforts to enforce the obligations of the seller under, the Master Purchase Agreement. Seller shall not terminate or consent to any termination of the Master Purchase Agreement.

9.2     Leases and Other Agreements. Seller shall not enter into, or consent to, any new lease, license agreement or similar agreement, or any amendment to the Lease, without Buyer's prior written approval, which may be granted or withheld in Buyer's sole and absolute discretion.

## ARTICLE 10- BROKERS AND EXPENSES

10.1     Brokers. Buyer and Seller each represents and warrants to the other that it has not entered into any agreement or taken any other action which would result in any brokerage commission, finder's fee or other compensation being due or payable with respect to the transaction contemplated hereby. Buyer shall indemnify, defend and hold Seller harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Seller by reason of any breach or inaccuracy of Buyer's representations and warranties contained in this Paragraph 10.1. Seller shall indemnify, defend and hold Buyer harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Buyer by reason of any breach or inaccuracy of Seller's representations and warranties contained in this Paragraph 10.1. This Paragraph 10.1 shall survive the Closing.

10.2     Legal and Other Fees. Each of Seller and Buyer is being represented by its own in-house counsel, and Buyer also is being represented by Goodwin Procter LLP. At the Closing, Seller shall reimburse Buyer for one-half (1/2) of the fees charged by Buyer's outside counsel. Except as provided in the previous sentence and in Paragraphs 8.3 and 8.4, each party shall pay its own expenses incurred in connection with this Agreement and the transaction contemplated hereby.

## ARTICLE 11 - RISK OF LOSS

11.1     Condemnation.

11.1.1 Right to Terminate. If, prior to the Closing, all or any portion of the Property is taken by eminent domain (or is the subject of a pending taking which has not yet been consummated), then (i) Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof, (ii) Buyer may elect to terminate this Agreement by giving written notice to Seller at any time prior to the Closing. The failure by Buyer to so elect in writing to terminate this Agreement shall be deemed an election not to terminate this Agreement.

11.1.2 Assignment of Proceeds. If Buyer elects not to terminate this Agreement as provided in Paragraph 11.1.1, there shall be no abatement of the Purchase Price; provided, however, that at the Closing, (i) Seller shall pay to Buyer the amount of

12

2016399-5

HACLA 002288

**106**

any award for or other proceeds on account of such taking which have been actually paid to Seller prior to the Closing as a result of such taking, or (ii) to the extent such award or proceeds have not been paid, Seller shall assign to Buyer at the Closing, without recourse to Seller, the rights of Seller to, and Buyer shall be entitled to receive and retain, all awards for the taking of the Property or such portion thereof.

11.2    Destruction or Damage.  If the Property is damaged or destroyed prior to the Closing, Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  Buyer shall not have any right to terminate this Agreement on account thereof, but at the Closing (i) Buyer shall receive a credit against the Purchase Price equal to the amount of any similar credit received by Seller under the Master Purchase Agreement, and (ii) Seller shall assign to Buyer, without recourse to Seller, all of Seller's right, title and interest in and to any and all proceeds of insurance on account of such damage or destruction.

## ARTICLE 12 - DEFAULTS AND REMEDIES

12.1    Seller's Default.  If the Closing fails to occur on the Closing Date because of Seller's default or breach, then Buyer may elect, as its sole and exclusive remedy, either to (i) terminate this Agreement, in which case Seller shall reimburse Buyer, and Buyer may recover from Seller, an amount equal to the out-of-pocket costs incurred by Buyer in connection with the transaction contemplated by this Agreement, as evidenced by paid invoices or other reasonably satisfactory backup documentation, or (ii) maintain an action for specific performance; provided, however, that if specific performance is unavailable because Seller has sold the Property to another party, then Buyer may pursue an action against Seller to recover all of Buyer's damages, including any difference between the purchase price paid by such other party and the Purchase Price.

12.2    Buyer's Default.  If the Closing fails to occur because of Buyer's default, then Seller may, as its sole and exclusive remedy, terminate this Agreement and maintain an action against Buyer to recover Seller's actual damages, up to a maximum amount of Fifty Thousand Dollars ($50,000).

## ARTICLE 13- MISCELLANEOUS

13.1    Entire Agreement; Waivers and Amendments.  This Agreement is the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the matters contained in this Agreement.  Any waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be set forth in writing and duly executed by or in behalf of the party to be bound thereby.  No waiver by any party of any breach hereunder shall be deemed a waiver of any other or subsequent breach.

13.2.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such

13

HACLA 002289

signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this Agreement attached thereto.

13.3 **Time of Essence**. Time is of the essence in the performance of and compliance with each of the provisions and conditions of this Agreement.

13.4 **Survival/Merger**. Except for the provisions of this Agreement which are explicitly stated to survive the Closing, none of the terms of this Agreement shall survive the Closing and the delivery of the Deed and any other documents and instruments by Seller and the acceptance thereof by Buyer shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Buyer and Seller to be performed hereunder.

13.5 **Notices**. Any communication, notice or demand of any kind whatsoever which either party may be required or may desire to give to or serve upon the other shall be in writing and delivered by personal service, by an express delivery (such as Federal Express) or courier service that provides receipted delivery service, delivery charges prepaid, by electronic communication, whether by telex, telegram or facsimile (and, if the communication, notice or demand seeks to a declare a default under or terminate this Agreement, confirmed in writing sent by registered or certified mail, postage prepaid, return receipt requested), or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

Buyer:

Housing Authority of the City of Los Angeles
2600 Wilshire Boulevard, 3rd Floor
Los Angeles, California 90057
Attention: Rudolf Montiel, President and CEO
Facsimile: (213) 252-1811

With a copies to:

Office of the Los Angeles City Attorney
916 City Hall East
200 North Main Street
Los Angeles, California 90012
Attention: Becky Clark
Facsimile: (213) 978-7957

Goodwin Procter LLP
601 South Figueroa Street, 41st Floor
Los Angeles, California 90017
Attention: Edward C. Hagerott, Jr.
Facsimile: (213) 623-1673

14

HACLA 002290

Seller:                          9901 Alameda, LLC
                                 c/o Meruelo Maddux Properties, Inc.
                                 761 Terminal Street
                                 Building 1, Second Floor
                                 Los Angeles, California 90021
                                 Attention: John Maddux
                                 Facsimile: (213) 291-2830

with a copy to:                  Meruelo Maddux Properties, Inc.
                                 761 Terminal Street
                                 Building 1, Second Floor
                                 Los Angeles, California 90021
                                 Attention: Todd W. Nielsen, Esq.
                                 Facsimile: (213) 291-2830

Escrow Holder:                   Commerce Escrow Company
                                 1545 Wilshire Boulevard, 6th Floor
                                 Los Angeles, California 90017
                                 Attention: Dwayne Butler
                                 Facsimile: (213) 201-5188

Any party may change its address for notice by written notice given to the other in the manner provided in this Paragraph 13.5. Any such communication, notice or demand shall be deemed to have been duly given or served (i) on the date personally served, if by personal service, or (ii) on the date of confirmed delivery, if by express delivery or courier service, electronic communication or registered or certified mail; provided, however, that any communication, notice or demand received by courier delivery or electronic communication that is received after 5:00 p.m. (local time for the addressee) shall be deemed to have been received on the next business day.

    13.6   Further Assurances.  The parties agree to execute such instructions to the Escrow Holder and the Title Company and such other instruments and to do such further acts as may be reasonably necessary to carry out the provisions of this Agreement.

    13.7   Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such invalidity or prohibition shall be construed as if such invalid or prohibited provision had not been inserted herein and shall not affect the remainder of such provision or the remaining provisions of this Agreement.

    13.8   Interpretation.  The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto. Paragraph headings of this Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Agreement. References to "Paragraphs" are to paragraphs of this Agreement, unless otherwise specifically provided.

15

20183093-3

HACLA 002291

109

Unless expressly indicated to the contrary, the terms "include", "includes", "including" and similar terms shall be construed as if followed by the phrase "without limitation". The terms "person", "party" and "entity" include natural persons, firms, partnerships, limited liability companies, corporations and any other public or private legal entity. The term "amend" includes modify, supplement, renew, extend, replace, restate and substitute, and the term "amendment" includes modification, supplement, renewal, extension, expansion, replacement, restatement and substitution. The singular of any word includes the plural, and vice-versa. The use of any gender includes all genders. A reference to any specific law, regulation, code, document or agreement includes any future amendments of the law, regulation, code, document or agreement, as the case may be.

13.9     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the conflicts of law principles of said State.

13.10     Attorneys' Fees.  For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photostatting, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney. If any action be commenced (including an appeal thereof) to enforce any of the provisions of this Agreement or to enforce a judgment, whether or not such action is prosecuted to judgment ("Action"), (i) the unsuccessful party therein shall pay all costs incurred by the prevailing party therein, including reasonable attorneys' fees and costs, court costs and reimbursements for any other expenses incurred in connection therewith, and (ii) as a separate right, severable from any other rights set forth in this Agreement, the prevailing party therein shall be entitled to recover its reasonable attorneys' fees and costs incurred in enforcing any judgment against the unsuccessful party therein, which right to recover post-judgment attorneys' fees and costs shall be included in any such judgment. The right to recover post-judgment attorneys' fees and costs shall (a) not be deemed waived if not included in any judgment, (b) survive the final judgment in any Action, and (c) not be deemed merged into such judgment. The rights and obligations of the parties under this Paragraph 13.10 shall survive the termination of this Agreement.

13.11     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors, and assigns.

13.12     No Third-Party Beneficiaries.  No third party shall have any rights hereunder.

13.13     Business Days.  If any of the dates specified in this Agreement shall fall on a Saturday, a Sunday or a holiday, then the date of such action shall be deemed to be extended to the next business day.

13.14     Exhibits.  Exhibits A through I, inclusive, attached hereto are incorporated herein by reference.

16

HACLA 002292

110

Case 2:11-cv-01626-FMO-CW   Document 360   Filed 10/04/13   Page 40 of 95   Page ID #:7486
Case 2:11-cv-01626-FMO-CW   Document 151-2   Filed 12/26/11   Page 18 of 70   Page ID
#:2193

[SIGNATURES ON NEXT PAGE]

2089399-5

17

HACLA 002293

**111**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

SELLER:                          9901 ALAMEDA, LLC

                                 By: _____
                                    Name: _____
                                    Title: _____

BUYER:                           HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

                                 By: _____
                                    Rudolf C. Montiel
                                    President and CEO

APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY


By: _____
Name: Becky Clark, Esq.
Title:   Deputy City Attorney

Date: _____

HACLA 002294

112

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

SELLER:

9901 ALAMEDA, LLC

By: _____
Name: _____
Title: _____

BUYER:

HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

By: _____
Rudolf C. Montiel
President and CEO

APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY

By: _____
Name: Becky Clark, Esq.
Title: Deputy City Attorney

Date: 3/26/08

20193192-6

·18

HACLA 002295

113

## ACKNOWLEDGEMENT OF RECEIPT AND AGREEMENT OF ESCROW HOLDER

The undersigned acknowledges receipt of this Agreement and agrees to act as Escrow Holder in accordance with the terms of this Agreement.

**COMMERCE ESCROW COMPANY**

By: _____
Authorized Signatory

Date: March ___, 2008

HACLA 002296

**114**

## EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND

PARCEL A:

IN THE RANCHO TAJAUTA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING THAT PORTION OF THE 28.96 ACRE TRACT ALLOTTED TO TOMASA VALENZUELA BY DECREE OF PARTITION OF SAID RANCHO RENDERED IN DISTRICT COURT OF 17 JUDICIAL DISTRICT OF STATE OF CALIFORNIA, IN AND FOR THE COUNTY OF LOS ANGELES, ON SEPTEMBER 12, 1874, AND RECORDED IN BOOK 31 PAGE 154 OF DEEDS, DESCRIBED AS FOLLOWS: BEGINNING AT STATION 5, BEING THE SOUTHEAST CORNER OF SAID TOMASA VALENZUELA TRACT, AS PER MAP FILED IN SUIT FOR PARTITION BEING CASE NO. 1200, DISTRICT COURT ABOVE REFERRED TO; THENCE NORTH 6 DEGREES 20 MINUTES WEST ALONG THE EAST LINE OF TAJAUTA RANCHO, 6.10 CHAINS; THENCE SOUTH 89 DEGREES 10 MINUTES WEST 22.30 CHAINS TO THE EAST LINE OF NERVIO VALENZUELA ALLOTMENT; THENCE SOUTH 5.54 CHAINS ALONG THE EAST LINE OF NERVIO VALENZUELA TRACT AND THE EAST LINE OF THE LAND CONVEYED TO EDWARD B. REED BY DEED RECORDED IN BOOK 181 PAGE 25 OF DEEDS, TO THE SOUTH LINE OF SAID TOMASA VALENZUELA TRACT; THENCE EAST ALONG SAID SOUTH LINE 22.69 CHAINS TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING WITHIN THE LINES OF THAT CERTAIN PARCEL OF LAND MARKED "PERIMETER DESCRIPTION" AS DESCRIBED IN THE FINAL DECREE OF CONDEMNATION ENTERED IN SUPERIOR COURT, LOS ANGELES COUNTY, A CERTIFIED COPY OF WHICH WAS RECORDED ON FEBRUARY 1, 1944, AS DOCUMENT NO. 1340, IN BOOK 20621 PAGE 213 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B:

THAT PORTION OF THE RANCHO SAN ANTONIO, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN DIVIDING LINE BETWEEN RANCHOS TAJAUTA AND SAN ANTONIO, SAID POINT BEING THE SOUTHEAST CORNER OF TOMASA VALENZUELA 28.96 ACRE TRACT HEREINBEFORE DESCRIBED; THENCE EAST AND ALONG THE NORTH BOUNDARY OF LAND NOW OR FORMERLY OWNED BY GEORGE REED 7.15 CHAINS TO THE WEST LINE OF A 30 FOOT ROAD ON THE WEST SIDE OF LOS ANGELES AND SAN PEDRO RAILROAD; THENCE NORTH 10 DEGREES 30 MINUTES WEST ALONG THE WEST SIDE OF SAID ROAD, 6.28 CHAINS; THENCE WEST 6.68 CHAINS TO THE EAST BOUNDARY LINE OF TAJAUTA RANCHO AND THENCE ALONG SAID RANCH LINE SOUTHEASTERLY 6.08 CHAINS TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THE EASTERLY 10 FEET, MEASURED AT RIGHT ANGLES, AS CONVEYED TO THE COUNTY OF LOS ANGELES FOR ROAD PURPOSES BY DEED RECORDED IN BOOK 6141 PAGE 34 OF DEEDS.

2089399-5

A-1

HACLA 002297

115

PARCEL C:

THAT PORTION OF THE NORTH HALF OF THE 28.96 ACRE TRACT OF LAND IN THE RANCHO TAJAUTA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ALLOTTED TO TOMASA VALENZUELA, BY DECREE OF PARTITION ENTERED IN CASE NO: 1200 OF THE 17TH JUDICIAL DISTRICT COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF LOS ANGELES, A CERTIFIED COPY THEREOF WAS RECORDED ON SEPTEMBER 19, 1874, IN BOOK 31 PAGE 154 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT 165 OF NEVADA VISTA VILLA TRACT, AS SHOWN ON MAP RECORDED IN BOOK 6 PAGE 190 OF MAPS, RECORDS OF SAID COUNTY; SAID POINT OF BEGINNING BEING IN THE SOUTHERLY LINE OF 97TH STREET; THENCE EASTERLY ALONG SAID SOUTHERLY LINE, NORTH 89 DEGREES 12 MINUTES 10 SECONDS EAST 315.04 FEET TO A POINT; THENCE CONTINUING ALONG SAID SOUTHERLY LINE NORTH 89 DEGREES 11 MINUTES 10 SECONDS EAST 1068.61 FEET TO A POINT SAID POINT LYING SOUTH 0 DEGREES 48 MINUTES 50 SECONDS EAST 25 FEET AND NORTH 89 DEGREES 11 MINUTES 10 SECONDS EAST 33.54 FEET FROM THE INTERSECTION OF THE CENTER LINE OF 97TH STREET WITH THE CENTER LINE OF LAUREL STREET SAID POINT BEING ALSO THE TRUE POINT OF BEGINNING FOR THIS DESCRIPTION; THENCE SOUTH 0 DEGREES 48 MINUTES 50 SECONDS EAST TO THE NORTHERLY LINE OF THE LAND DESCRIBED AS PARCEL "A" IN THE DEED TO FINKELSTEIN SUPPLY COMPANY, RECORDED ON MAY 3, 1947 AS INSTRUMENT NO. 964, IN BOOK 24519 PAGE 246 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE EASTERLY LINE OF SAID RANCHO TAJAUTA; THENCE NORTHWESTERLY ALONG SAID EASTERLY LINE TO SAID SOUTHERLY LINE OF 97TH STREET (50) FEET WIDE); THENCE ALONG SAID SOUTHERLY LINE SOUTH 89 DEGREES 11 MINUTES 10 SECONDS WEST TO THE TRUE POINT OF BEGINNING FOR THIS DESCRIPTION.

PARCEL D:

THAT PORTION OF THE RANCHO SAN ANTONIO, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, INCLUDED WITHIN THE FOLLOWING DESCRIBED LINES:

BEGINNING AT THE INTERSECTION OF THE SOUTHERLY LINE OF 97TH STREET, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES RECORDED ON NOVEMBER 27, 1905 AS INSTRUMENT NO. 87, IN BOOK 2523 PAGE 95 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY WITH THE EASTERLY LINE OF THE 28.96 ACRE TRACT OF LAND IN THE RANCHO TAJAUTA, IN SAID COUNTY AND STATE ALLOTED TO TOMASA VALENZUELA, BY DECREE OF PARTITION ENTERED IN CASE NO. 1200 OF THE 17TH JUDICIAL DISTRICT COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF LOS ANGELES, A CERTIFIED COPY THEREOF WAS RECORDED ON SEPTEMBER 19, 1874, IN BOOK 31 PAGE 154 OF DEEDS, RECORDS OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID EASTERLY LINE TO THE NORTHERLY LINE OF THE LAND DESCRIBED AS PARCEL "B" IN THE DEED TO FINKELSTEIN SUPPLY COMPANY, RECORDED ON MAY 3, 1947 AS INSTRUMENT NO. 964, IN BOOK 24519 PAGE 246 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE WESTERLY LINE OF ALAMEDA STREET, AS ESTABLISHED BY THE FINAL DECREE OF CONDEMNATION ENTERED IN CASE NO. 471285 SUPERIOR COURT, A CERTIFIED COPY THEREOF BEING RECORDED IN BOOK 22452 PAGE 210 OF OFFICIAL RECORDS OF SAID COUNTY AND BY THE DEED TO THE COUNTY OF LOS ANGELES,

2089399-5

A-2

HACLA 002298

116

RECORDED ON MAY 4, 1942, AS INSTRUMENT NO. 778 IN BOOK 19270 PAGE 312 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE NORTHWESTERLY ALONG SAID WESTERLY LINE TO THE SOUTHERLY LINE OF 97TH STREET THENCE WESTERLY ALONG SAID SOUTHERLY LINE TO THE POINT OF BEGINNING.

A-3

HACLA 002299

117

## EXHIBIT B

## LEASE AND GUARANTIES AND SECURITY INSTRUMENTS

Lease

1.  AIR Standard Industrial/Commercial Single-Tenant Lease – Net dated for reference purposes May 15, 1999, and executed June 3, 1999, between Shama, LLC, as "Lessor," and Columbia Steel, LLC, as lessee, as amended by:

    •   Lease Modification and Cure Agreement dated January 27, 2000, between Lessor and Cambridge Steel, LLC (formerly known as Columbia Steel, LLC), and countersigned by Guarantors (as defined below).

    •   Assignment and Assumption of Lease, dated as of the latest date of execution on March 9, 2001, between Lessor, Cambridge Steel, LLC, as assignor, and Lex West, LLC, as assignee, and countersigned by Guarantors.

    •   Landlord's Agreement dated March 9, 2001, between Lessor and La Salle Bank National Association.

Guaranties and Security Instruments

2.  Guaranty of Lease dated June 3, 1999, by Thomas K. Skinker, Merrill G. Bodily and Paul Jaeckel ("Guarantors").

3.  Deed of Trust dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

4.  Deed of Trust with Assignment of Rents dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

5.  Guaranty of Lease dated March 9, 2001, by Lexington Steel, Inc.

2089399-3                                        B-1

HACLA 002300

**118**

**EXHIBIT C**

**FORM OF OPTION AGREEMENT**

[See the attached agreement]

2089399-5

C-1

HACLA 002301

119

## OPTION AGREEMENT AND JOINT ESCROW INSTRUCTIONS
### (Portion of 9901 South Alameda Street)

THIS OPTION AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") is made as of [March 31], 2008 by and between the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Seller"), and 9901 ALAMEDA, LLC, a California limited liability company ("Buyer"), with reference to the following facts:

### RECITALS

A.   Immediately prior to the effectiveness of this Agreement, Seller purchased from Buyer the real property commonly known as 9901 South Alameda Street in an unincorporated portion of Los Angeles County, California and more particularly described on Exhibit A-1 (the "Site") and certain related personal property.

B.   Buyer desires to acquire from Seller, and Seller desires to grant to Buyer, an option to purchase the Property (as defined below), which includes a portion, but not all, of the Site, upon the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, with reference the foregoing Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1 – BASIC TERMS

This Article 1 sets forth certain terms of this Agreement, subject, however, to any adjustments set forth elsewhere in this Agreement.

1.1   Purchase Price: Twenty-Two Million Five Hundred Thousand Dollars ($22,500,000).

1.2   Outside Exercise Date: [September 23,] 2009. [To be 5 business days prior to the Closing Date]

1.3   Outside Closing Date: [September 30] 2009. [To be 18 months after the date of the Agreement]

1.4   Escrow Holder: Chicago Title Company.

1.5   Title Company: Chicago Title Insurance Company.

### ARTICLE 2 – GRANT AND TERMS OF OPTION

2.1   Grant of Option. Upon the terms and conditions set forth in this Agreement, Seller hereby grants Buyer the exclusive right and option (the "Option") to purchase from Seller the following (collectively, the "Property"):

LIBD/2039593.3

HACLA 002302

**120**

**2.1.1** **Real Property.** Subject to Paragraphs 8.3 and 8.4, the portion of the site depicted on Exhibit A-2 (said portion consists of approximately ten (10) acres) (the "Land"), together with all improvements located thereon (the "Improvements"), and all rights, privileges, easements and appurtenances to the Land, if any (the Land, the Improvements and all such rights, privileges, easements and appurtenances are referred to collectively herein as the "Real Property").

**2.1.2** **Lease.** All of Seller's interest as lessor under the lease identified on Exhibit B (the "Lease") and any and all guaranties and security instruments relating thereto, including those listed on Exhibit B, if the same are in effect at the Closing.

**2.1.3** **Personal Property.** Any and all tangible personal property owned by Seller that is located on the Land and/or the Improvements as of the Closing and used exclusively in the operation or maintenance of the Land and/or the Improvements (collectively, the "Personal Property"), if any.

**2.1.4** **Intangible Property.** All of Seller's interest in any and all licenses, approvals, certificates, permits, warranties, guaranties, indemnities and claims that relate to the Real Property and/or the Personal Property or any portion thereof (collectively, the "Intangible Property").

**2.2** **Term.** The term of the Option shall commence on the date of this Agreement and shall expire at 5:00 p.m., California time, on the date specified in Paragraph 1.2 (the "Expiration Time") unless Buyer has timely delivered a Buyer's Exercise Notice as defined and as provided in Paragraph 2.3.

**2.3** **Method of Exercise.** Buyer shall have the right, but not the obligation, to exercise the Option at any time prior to the Expiration Time by delivering written notice thereof (the "Buyer's Exercise Notice") to Seller. Buyer shall, in Buyer's Exercise Notice, specify the date of the Closing, provided that Buyer may not specify a date for Closing (as defined in Paragraph 6.2) that is later than the date specified in Paragraph 1.3 or that is sooner that five (5) business days after Seller's receipt of Buyer's Exercise Notice.

**2.4** **Purchase Price.** If Buyer exercises the Option, the purchase price for the Property shall be the amount specified in Paragraph 1.1 (the "Purchase Price"), subject to the prorations and adjustments provided in this Agreement.

## ARTICLE 3- BUYER'S DUE DILIGENCE; AS-IS PURCHASE

**3.1** **Access.** Commencing on the date of this Agreement and continuing until the Closing or earlier termination of this Agreement, Buyer and its authorized agents and representatives may enter upon the Real Property for the purpose of conducting Buyer's due diligence with respect to its purchase of the Property.

LIBD/2039553.1

2

HACLA 002303

**121**

**3.1.1   Conditions to Entry.** Neither Buyer nor its agents and representatives may enter upon the Real Property for the purpose of inspecting or testing any portion thereof or for any other reason without having given Seller notice of its intention to enter the Real Property at least one (1) day before such entry. Seller may impose reasonable conditions and restrictions on Buyer's right to enter the Real Property under this Agreement and Buyer agrees to comply with any such conditions and restrictions in exercising its rights hereunder. In no event may Buyer drill or bore on or through the surface of the Land or conduct any other invasive testing of the Property without first obtaining the written consent thereto of Seller, which consent shall not be unreasonably withheld. After making any tests and inspections, Buyer shall promptly restore the Real Property to its condition prior to such tests and inspections (which obligation shall survive the Closing or any termination of this Agreement).

**3.1.2   Insurance.** Before entering the Real Property, Buyer shall obtain and maintain, or cause its consultants to obtain and maintain, general liability insurance, from an insurer reasonably acceptable to Seller, in the amount of One Million Dollars ($1,000,000) combined single limit for personal injury and property damage per occurrence, such policies to name Seller as an additional insured party, which insurance shall provide coverage against any claim for personal liability or property damage caused by Buyer or its representatives in connection with such inspections and tests. Each such policy must provide that the insurer waives any right of subrogation against Seller.

**3.1.3   Indemnification.** Buyer shall keep the Property free from all liens and indemnify, defend and hold harmless Seller and Seller's officers, directors, shareholders, beneficiaries, members, partners, affiliates, agents, employees and attorneys, and their respective successors and assigns, from and against all claims, actions, losses, liabilities, damages, costs and expenses (including attorneys' fees and costs) incurred by or claimed against Seller by reason of any damage to the Real Property or injury to persons (including Buyer's employees) caused by Buyer and/or its agents, employees or contractors in connection with their entry upon the Property and/or the performance of any inspections, tests or other due diligence related thereto. This Paragraph 3.1.3 shall survive the Closing or any termination of this Agreement.

**3.2   AS-IS.** BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS" BASIS AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN PARAGRAPH 4.1, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING: (i) the quality, nature, adequacy and physical condition and aspects of the Property, (ii) the existence, quality, nature, adequacy and physical condition of utilities serving the Real Property, (iii) the development potential of the Real Property, and the Real Property's and Personal Property's use, habitability, merchantability or fitness, or the suitability, value or adequacy of the Real Property and the Personal Property for any particular purpose, (iv) the zoning or other legal status of the Real Property or any other public or private restrictions on use of the Real Property, (v) the compliance of the Real Property and the Personal Property with any applicable codes, laws, regulations, statutes, ordinances,

LIBD/20695513

3

HACLA 002304

**122**

covenants, conditions and restrictions of any governmental authority or of any other person or entity, (*vi*) the presence of hazardous materials on, under or about the Real Property, (*vii*) the quality of any labor and materials used in the Improvements, (*viii*) the condition of title to the Property, (*ix*) the condition of the Personal Property, (*x*) the Lease or other agreements affecting the Property, and (*xi*) the economics of the operation of the Property.

3.3    Hazardous Substances Disclosure. Without limiting Paragraph 3.2, pursuant to California Health and Safety Code Section 25359.7, Seller hereby notifies and informs Buyer that a release of hazardous substance (as said term is used in said code section) has come to be located on or beneath the Real Property, as more particularly provided in the environmental reports provided by Buyer to Seller in connection with Seller's purchase of the Site. Without limiting Paragraph 3.4, if Buyer purchases the Property pursuant to the Option, Buyer shall be responsible for all costs and expenses associated with any environmental remediation or mitigation activities at the Real Property. Additionally, if prior to the Closing Seller conducts any environmental remediation or mitigation activities with respect to the Real Property, then, at the Closing, Buyer shall reimburse Seller for the costs thereof (or, if the activities involve the entire Site or a portion of the Site in addition to the Real Property, the portion of such costs attributable to the Real Property). This Paragraph 3.3 shall survive the Closing.

3.4    Release. Effective as of the Closing, except for any claims, demands, causes of action, obligations, losses, damages, penalties, costs, fees and expenses (collectively, "Claims") arising out of (*i*) a breach by Seller of any of Seller's representations and warranties in Paragraph 4.1 of this Agreement or in any documents executed by Seller in favor of Buyer pursuant to this Agreement that is discovered by Buyer after the Closing, and (*ii*) a default by Seller after the Closing under those provisions of this Agreement that are expressly stated to survive the Closing or under any documents executed by Seller in favor of Buyer pursuant to this Agreement at or in connection with the Closing, Buyer, on behalf of itself and its successors and assigns, waives its right to recover from, and forever releases and discharges Seller and each of Seller's affiliates, each direct and indirect member, partner or other equity owner of Seller and Seller's affiliates and their respective managers, members, partners, officers, directors, shareholders, employees, attorneys, representatives and agents, from any and all Claims, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or are in any way connected with the Property, including the physical, environmental and structural condition of the Property or any law or regulation applicable thereto and specifically including any and all Claims relating to the release, presence, discovery or removal of hazardous materials at the Real Property. With respect to the waiver and release set forth herein relating to unknown and unsuspected claims, such waiver is made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY

HACLA 002305

AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Buyer acknowledges, stipulates and agrees that this Paragraph 3.4 is a material factor in Seller's decision to enter into this Agreement and to sell the Property to Buyer for the Purchase Price. This Paragraph 3.4 shall survive the Closing.

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

4.1 Representations and Warranties of Seller. Seller represents and warrants to Buyer that, as of the execution of this Agreement and as of the Closing, this Agreement is, and all of the documents executed by Seller which are to be delivered to Buyer at the Closing will be, duly authorized, executed, and delivered by Seller, and is and will be legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and does not and will not violate any provisions of any agreement to which Seller is a party or to which it is subject.

4.2 Representations and Warranties of Buyer. Buyer represents and warrants to Seller that the following statements are true and correct as of the execution of this Agreement and will also be true and correct as of the Closing:

4.2.1 Good Standing. Buyer is duly formed, validly existing and in good standing under the laws of the State of California.

4.2.2 Authorization and Validity. This Agreement is, and all of the documents executed by Buyer which are to be delivered to Seller at the Closing will be, duly authorized, executed, and delivered by Buyer, and is and will be legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and does not and will not violate any provisions of any agreement to which Buyer is a party or to which it is subject.

4.2.3 No Bankruptcy Proceedings. Buyer has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Buyer's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

4.3 Survival of Seller's Representations. The representations and warranties made by Seller in this Agreement shall survive the Closing and not be merged therein for a period of one (1) year and Seller shall only be liable to Buyer hereunder for a breach of a representation and warranty made in this Agreement with respect to which a claim is made by Buyer against Seller on or before one (1) year after the date of the Closing.

5

LIBD/2035522.1

HACLA 002306

124

## ARTICLE 5 - CONDITIONS TO CLOSING

**5.1** <u>Conditions to Buyer's Obligations</u>. Buyer's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions (the "Buyer's Conditions Precedent"):

**5.1.1** <u>Title Policy</u>. The Title Company shall have committed to issue, at the Closing, an Owner's Policy of Title Insurance to Buyer in a form and containing such exceptions as are acceptable to Buyer (the "Title Policy").

**5.1.2** <u>No Breaches</u>. Seller shall have timely delivered the items described in <u>Paragraph 6.3</u> as provided therein and Seller shall not have materially breached any of Seller's other covenants set forth in this Agreement as of the Closing.

**5.1.3** <u>Accuracy of Representations and Warranties</u>. None of Seller's representations and warranties in <u>Paragraph 4.1</u> shall be untrue or inaccurate in any material respect as of the Closing.

The Buyer's Conditions Precedent are solely for the benefit of Buyer and may be waived only by Buyer. Buyer shall not act or fail to act for the purpose of permitting or causing any of the Buyer's Conditions Precedent to be unsatisfied as of the Closing Date. If a Buyer's Condition Precedent is not satisfied on the Closing Date, then Buyer may (i) waive the unsatisfied condition and proceed to close the transaction without any reduction in the Purchase Price, or (ii) terminate this Agreement by delivering written notice thereof to Seller and Escrow Holder.

**5.2** <u>Conditions to Seller's Obligations</u>. Seller's obligation to consummate the purchase and sale transaction contemplated by this Agreement is subject to the satisfaction of the following conditions (the "Seller's Conditions Precedent"):

**5.2.1** <u>No Breaches</u>. Buyer shall have timely delivered the items described in <u>Paragraph 6.4</u> as provided therein and Buyer shall not have materially breached any of Buyer's other covenants set forth in this Agreement as of the Closing.

**5.2.2** <u>Accuracy of Representations and Warranties</u>. None of Buyer's representations and warranties in <u>Paragraph 4.2</u> shall be untrue or inaccurate in any material respect as of the Closing.

**5.2.3** <u>HUD Approval</u>. If applicable under <u>Paragraph 8.2</u>, Seller shall have obtained all necessary approvals from HUD.

The Seller's Conditions Precedent are solely for the benefit of Seller and may be waived only by Seller. Seller shall not act or fail to act for the purpose of permitting or causing any of the Seller's Conditions Precedent to be unsatisfied as of the Closing Date. If a Seller's Condition

LIBD/2069533.3

6

HACLA 002307

**125**

Precedent is not satisfied on the Closing Date, then Seller may *(i)* waive the unsatisfied condition and proceed to close the transaction, or *(ii)* terminate this Agreement by delivering written notice thereof to Buyer.

## ARTICLE 6 - ESCROW AND CLOSING

6.1     Opening of Escrow.  If Buyer exercises the Option, Buyer shall concurrently deliver a duplicate original of this Agreement to the escrow holder specified in Paragraph 1.4 ("Escrow Holder") for purpose of opening an escrow to consummate the sale of the Property pursuant to this Agreement (the "Escrow"). This Agreement, together with such further instructions, if any, as the parties shall provide to Escrow Holder by written agreement, shall constitute the escrow instructions with respect to the Escrow. If any requirements relating to the duties or obligations of Escrow Holder hereunder are not acceptable to Escrow Holder, or if Escrow Holder requires additional instructions, the parties agree to make such deletions, substitutions and additions hereto as counsel for Buyer and Seller shall mutually approve, which additional instructions shall not substantially alter the terms of this Agreement unless otherwise expressly agreed to by Seller and Buyer.

6.2 .    Closing Date.  If Buyer timely exercises the Option, the purchase and sale transaction contemplated by this Agreement shall close on the date specified in Buyer's Exercise Notice (the "Closing Date"). For purposes of this Agreement, the "Closing" shall be deemed to occur as of the date and time that the Deed is recorded in the Official Records of Los Angeles County.

6.3     Seller's Deliveries to Escrow.  At least one (1) business day prior to the Closing Date, Seller shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

6.3.1 .  Deed.  One (1) original grant deed in the form of Exhibit C executed by Seller and acknowledged by a notary (the "Deed").

6.3.2     Bill of Sale and Assignment.  One (1) original Bill of Sale and Assignment in the form of Exhibit D executed by Seller (the "Bill of Sale and Assignment").

6.3.3     Assignment of Lease .  If applicable, two (2) originals of an Assignment and Assumption Agreement in the form of Exhibit E executed by Seller (the "Assignment of Lease").

6.3.4     Title Company Requirements.  Such documents and instruments as the Title Company may reasonably require to issue the Title Policy.

6.3.5.    Other Documents.  Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

7

LIBD/2089553.3

HACLA 002308

126

6.4    Buyer's Deliveries to Escrow. At least one (1) business day prior to the Closing Date, Buyer shall deliver or cause the following items to be delivered to Escrow Holder or the Title Company, as appropriate:

6.4.1    Funds. The Purchase Price, together with such other sums as Escrow Holder shall require to pay Buyer's share of the closing costs, prorations, reimbursements and adjustments as set forth in Article 7, in immediately available funds.

6.4.2    Assignment of Lease. If applicable, two (2) originals of the Assignment of Lease executed by Buyer.

6.4.3    Organizational and Authority Documents. Copies of Buyer's LLC-1 and operating agreement (and any amendments thereto), and a resolution or unanimous written consent authorizing the purchase of the Property as provided in this Agreement.

6.4.4    Title Company Requirements. Such documents and instruments as the Title Company may reasonably require to issue the Title Policy.

6.4.5    Other Documents. Any other documents, instruments or agreements reasonably necessary to effectuate the transaction contemplated by this Agreement.

6.5    Disbursements and Other Actions by Escrow Holder. Upon the Closing, Escrow Holder shall promptly undertake all of the following:

6.5.1    Recordation of Deed. Cause the Deed and any other documents which the parties hereto may mutually direct to be recorded in the Official Records of Los Angeles County and obtain conformed copies thereof for distribution to Buyer and Seller.

6.5.2    Calculation and Disbursement. Disburse all funds deposited with Escrow Holder by Buyer as follows:

(a)    first, deduct all items chargeable to the account of Seller pursuant to Article 7;

(b)    next, disburse the balance of the Purchase Price and any additional amounts owed to Seller under this Agreement to or as directed by Seller promptly upon the Closing by wire transfer in accordance with instructions received from Seller; and

(c)    next, disburse the remaining balance of the funds, if any, to Buyer promptly upon the Closing.

LIBD/2055553.3

8

HACLA 002309

127

6.5.3 <u>Title Policy</u>. Direct the Title Company to issue the Title Policy to Buyer.

6.5.4 <u>Deliveries to Seller</u>. Deliver to Seller: a copy of the Bill of Sale and Assignment; one (1) original Assignment of Lease; a conformed copy of the recorded Deed; and copies of Buyer's LLC-1, operating agreement and the authorizing resolution or written consent.

6.5.5 <u>Deliveries to Buyer</u>. Deliver to Buyer: the original Bill of Sale and Assignment; one (1) original Assignment of Lease; and a conformed copy of the recorded Deed.

6.6 <u>Deliveries By Seller to Buyer Upon Closing</u>. Seller shall deliver the following items to Buyer upon the Closing:

6.6.1 <u>Keys</u>. All keys in Seller's possession to all entrance doors to the Improvements.

6.6.2 <u>Tenant Notice</u>. If applicable, a notice to the tenant of the Property informing the tenant of the sale to Buyer, that the tenant's security deposit, if any, has been transferred to Buyer and the address to which future rent payments should be sent.

## ARTICLE 7- ADJUSTMENTS AND PRORATIONS

7.1 <u>Prorations</u>. The following shall be prorated and adjusted between Seller and Buyer as of the day of the Closing, except as otherwise specified:

7.1.1 <u>Taxes</u>. Non-delinquent taxes, including general real estate taxes, supplemental taxes and special assessments, and any improvement or other bonds affecting the Property, based upon the most recently available real estate or property tax information.

7.1.2 <u>Rents</u>. If applicable, rents and other charges under the Lease to the extent such monies have actually been collected by Seller. Rents and other charges under the Lease that are delinquent as of the Closing shall not be prorated, and rents and other amounts received by Buyer after the Closing from the tenant owing such delinquent rent or other charges shall be applied as set forth in <u>Paragraph 7.5</u>.

7.1.3 <u>Other Revenues</u>. Other revenues from the operation of the Property (i.e., other than rents and other charges under the Lease), if any.

7.1.4 <u>Utilities</u>. Charges for water, gas, electricity, telephone, sewer and other utilities (other than such charges which are the obligations of tenants to pay to the provider of such utility).

HACLA 002310

**128**

7.1.5   Other Items.  Such other items as are customarily prorated in a transaction of this nature.

For purposes of calculating prorations, Buyer shall be deemed to be in title to the Property, and, therefore, entitled to the income therefrom and, except as otherwise provided in this Agreement, responsible for the expenses thereof for the entire day upon which the Closing occurs.  All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty-five (365) day year.  The amount of such prorations shall be initially performed by Seller and Buyer at Closing based on information then available, but shall be subject to adjustment in cash after the Closing outside of escrow as and when complete and accurate information becomes available, if such information is not available at the Closing.  This Paragraph 7.1 shall survive the Closing.

7.2     Security Deposit.  Buyer shall receive a credit against the Purchase Price equal to the amount of any unapplied cash security deposit under the Lease, if in effect as of the Closing.

7.3     Closing Costs.  Seller shall pay (i) the premium for the  "CLTA" or "standard" coverage portion of the Title Policy, (ii) all of the documentary transfer tax imposed in connection with the sale of the Property, and (iii) one-half (½) of the fees and costs imposed by Escrow Holder.  Buyer shall pay (i) the portion of the premium for the Title Policy attributable to the "extended coverage" and any endorsements thereto, if applicable (ii) the recording fees for the Deed, and (iii) one-half (½) of the fees and costs of Escrow Holder.

7.4     Cancellation Fees.  If the sale of the Property contemplated hereunder does not occur because of a failure of a Seller's Condition Precedent or a default on the part of Buyer, all escrow and title cancellation fees shall be paid by Buyer, and if the sale of the Property does not occur because of a failure of a Buyer's Condition Precedent or a default on the part of Seller, all escrow and title cancellation fees shall be paid by Seller.  In all other cases, all escrow and title cancellation fees shall be shared equally by the parties.

7.5     Delinquent Rents.  If, as of the Closing, the Lease is in effect and the tenant is in arrears in the payment of rent or has not paid the rent payable by it for the month in which the Closing occurs (whether or not it is in arrears for such month as of the Closing), then (i) Buyer shall use reasonable and diligent efforts to collect such amounts after the Closing and shall keep Seller reasonably informed of its collection efforts, and (ii) any rents received by Buyer or Seller from the tenant after the Closing shall be applied to amounts due and payable during the following periods in the following order of priority: (a) first, to the month in which the Closing occurred; (b) second, to the months following the month in which the Closing occurred; and (c) thereafter, to the months preceding the month in which the Closing occurred.  If rents or any portion thereof received by Seller or Buyer after the Closing are due and payable to the other party by reason of this allocation, the appropriate sum shall be promptly paid to the other party.  Seller may maintain or pursue actions to collect delinquent rents after the Closing, provided that Seller's remedies for collection of rent from the tenant shall not include the right to

10

LIBD/2089553.3

HACLA 002311

129

bring an eviction proceeding or any other suit to recover possession or terminate the Lease. This Paragraph 7.5 shall survive the Closing.

## ARTICLE 8 - COVENANTS

8.1    Legal Description. Prior to the Expiration Time, Seller and Buyer shall cooperate to have a legal description prepared for the Land that reflects the boundaries and configuration shown on Exhibit A-2. When such description has been prepared and approved by the parties, then they shall execute an amendment to this Agreement that replaces Exhibit A-2 with the actual legal description. Each of Seller and Buyer shall be responsible for one-half (1/2) of the cost of preparing the legal description.

8.2    Development Activities. It is anticipated that the Real Property will be developed by Buyer with a commercial project (if Buyer exercises the Option and purchases the Property). To facilitate the development of the entire Site, Seller and Buyer shall cooperate with each other, and with the Community Redevelopment Agency of the City of Los Angeles (the "CRA/LA"), in pursuing the following entitlements and mitigation measures: (i) having the Site annexed by the City of Los Angeles (the Site presently is located in an unincorporated area of Los Angeles County), (ii) having the Site designated as a Redevelopment Area by the CRA/LA (whether as a new Redevelopment Area or as the result of the extension of an existing Redevelopment Area), (iii) having the Site subdivided such that the Property is comprised of one or more separate legal parcels, and (iv) having Century Boulevard extended and realigned so that it runs through the entire Site as generally depicted on the site plan attached as Exhibit A-3. Provided that the Closing occurs, each of Seller and Buyer shall be responsible for one-half (1/2) of the costs of subdividing the Property; at the Closing, Buyer shall reimburse Seller for Buyer's portion of the costs incurred to date and shall thereafter be responsible for one-half (1/2) of any additional costs. This Paragraph 8.2 shall survive the Closing.

8.3    Reconfiguration. Buyer has informed Seller that Buyer may desire for the boundaries of the Land (i.e. the land subject to the Option) to be reconfigured as generally depicted on Exhibit A-4 (the "Alternate Site Plan"). Seller hereby advises Buyer that Seller will not be able to convey the land depicted on the Alternate Site Plan without the approval of the U.S. Department of Housing and Urban Development ("HUD"). If Buyer informs Seller that Buyer desires to pursue the Alternate Site Plan, then Seller shall use commercially reasonable efforts to obtain the necessary approvals from HUD, including filing a demolition and disposition application. Buyer acknowledges, however, that Seller may not be able to obtain the necessary approvals and that Seller cannot assure Buyer that Seller will be able to convey the land shown on the Alternate Site Plan (other than such land which also is part of the Land).

8.4    Access Easement. If Century Boulevard is not extended to Alameda Street as reflected on Exhibit A-3, then Seller may, at the Closing, reserve from the Real Property conveyed to Buyer an easement for ingress and egress for the remainder of the Site from and to Alameda Street in a location reasonably acceptable to both Seller and Buyer.

8.5    No Transfers. Until the Closing or any early termination of this Agreement, no part of the Real Property will be sold, encumbered or otherwise transferred

HACLA 002312

130

without Buyer's consent, which shall not be unreasonably withheld; provided, however, that (i) Seller may encumber the Real Property with a deed of trust or similar lien so long as the lienholder acknowledges that its lien is subject to Buyer's rights under the Option, and (ii) Seller may enter into a purchase agreement for the Property so long as such agreement provides that it is subject to Buyer's rights under the Option.

## ARTICLE 9- BROKERS AND EXPENSES

9.1     Brokers.  Buyer and Seller each represents and warrants to the other that it has not entered into any agreement or taken any other action which would result in any brokerage commission, finder's fee or other compensation being due or payable with respect to the transaction contemplated hereby.  Buyer shall indemnify, defend and hold Seller harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Seller by reason of any breach or inaccuracy of Buyer's representations and warranties contained in this Paragraph 9.1.  Seller shall indemnify, defend and hold Buyer harmless from and against any claims, losses, damages, costs and expenses (including attorneys' fees and costs) incurred by Buyer by reason of any breach or inaccuracy of Seller's representations and warranties contained in this Paragraph 9.1.  This Paragraph 9.1 shall survive the Closing.

9.2     Legal and Other Fees.  Except as provided in Paragraphs 7.3, 7.4, 8.1 and 8.2, each party shall pay its own expenses incurred in connection with this Agreement and the transaction contemplated hereby.  Without limiting the generality of the foregoing, except as provided in the previous sentence, each party shall bear the expense of its own counsel and consultants in connection with this transaction.

## ARTICLE 10 - RISK OF LOSS

10.1     Condemnation.

10.1.1     Right to Terminate.  If, prior to the Closing, all or any portion of the Property is taken by eminent domain (or is the subject of a pending taking which has not yet been consummated), then (i) Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof, (ii) Buyer may elect to terminate this Agreement by giving written notice to Seller at any time prior to the Closing.  The failure by Buyer to so elect in writing to terminate this Agreement shall be deemed an election not to terminate this Agreement.

10.1.2     Assignment of Proceeds.  If Buyer elects not to terminate this Agreement as provided in Paragraph 10.1.1, there shall be no abatement of the Purchase Price; provided, however, that at the Closing, (i) Seller shall pay to Buyer the amount of any award for or other proceeds on account of such taking which have been actually paid to Seller prior to the Closing as a result of such taking, or (ii) to the extent such award or proceeds have not been paid, Seller shall assign to Buyer at the Closing, without recourse

12

LIBD/20895213

HACLA 002313

**131**

to Seller, the rights of Seller to, and Buyer shall be entitled to receive and retain, all awards for the taking of the Property or such portion thereof.

10.2   <u>Destruction or Damage</u>.  If the Property is damaged or destroyed prior to the Closing, Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  Buyer may then elect to terminate this Agreement or to have this Agreement remain in effect.  If Buyer elects not to terminate this Agreement, there shall be no abatement of the Purchase Price nor shall Buyer be entitled to any of Seller's insurance proceeds.

## ARTICLE 11 – BUYER'S REMEDIES

If the Closing fails to occur on the Closing Date because of Seller's default or breach, then Buyer may elect, as its sole and exclusive remedy, either to (i) terminate this Agreement, or (ii) maintain an action for specific performance; <u>provided</u>, <u>however</u>, that if specific performance is unavailable because Seller has sold the Property to another party in violation of this Agreement, then Buyer may pursue an action against Seller to recover all of Buyer's damages, including any difference between the purchase price paid by such other party and the Purchase Price.

## ARTICLE 12 - MISCELLANEOUS

12.1   <u>Entire Agreement; Waivers and Amendments</u>.  This Agreement is the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the matters contained in this Agreement.  Any waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be set forth in writing and duly executed by or in behalf of the party to be bound thereby.  No waiver by any party of any breach hereunder shall be deemed a waiver of any other or subsequent breach.

12.2   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this Agreement attached thereto.

12.3   <u>Time of Essence</u>.  Time is of the essence in the performance of and compliance with each of the provisions and conditions of this Agreement.

12.4   <u>Survival/Merger</u>.  Except for the provisions of this Agreement which are explicitly stated to survive the Closing, none of the terms of this Agreement shall survive the Closing and the delivery of the Deed and any other documents and instruments by Seller and the acceptance thereof by Buyer shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Buyer and Seller to be performed hereunder.

12.5   <u>Notices</u>.  Any communication, notice or demand of any kind whatsoever which either party may be required or may desire to give to or serve upon the other shall be in

13

LIBD/20895513

HACLA 002314

**132**

writing and delivered by personal service, by an express delivery (such as Federal Express) or courier service that provides receipted delivery service, delivery charges prepaid, by electronic communication; whether by telex, telegram or facsimile (and, if the communication, notice or demand seeks to a declare a default under or terminates this Agreement, confirmed in writing sent by registered or certified mail, postage prepaid, return receipt requested), or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

Seller:
    Housing Authority of the City of Los Angeles
    2600 Wilshire Boulevard, 3rd Floor
    Los Angeles, California 90057
    Attention: Rudolf Montiel, President and CEO
    Facsimile: (213) 252-1811

With a copies to:
    Office of the Los Angeles City Attorney
    916 City Hall East
    200 North Main Street
    Los Angeles, California 90012
    Attention: Becky Clark
    Facsimile: (213) 978-7957

    Goodwin Procter LLP
    601 South Figueroa Street, 41st Floor
    Los Angeles, California 90017
    Attention: Edward C. Hagerott, Jr.
    Facsimile: (213) 623-1673

Buyer:
    9901 Alameda, LLC
    c/o Meruelo Maddux Properties, Inc.
    761 Terminal Street
    Building 1, Second Floor
    Los Angeles, California 90021
    Attention: John Maddux
    Facsimile: (213) 291-2830

with a copy to:
    Meruelo Maddux Properties, Inc.
    761 Terminal Street
    Building 1, Second Floor
    Los Angeles, California 90021
    Attention: Todd W. Nielsen, Esq.
    Facsimile: (213) 291-2830

14

LIBD/2169353.3

HACLA 002315

Escrow Holder:          Chicago Title Company,
                        700 South Flower Street, Suite 800
                        Los Angeles, California  90017
                        Attention:
                        Facsimile:  (213) _____

Any party may change its address for notice by written notice given to the other in the manner provided in this Paragraph 12.5.  Any such communication, notice or demand shall be deemed to have been duly given or served *(i)* on the date personally served, if by personal service, or *(ii)* on the date of confirmed delivery, if by express delivery or courier service, electronic communication or registered or certified mail; provided, however, that any communication, notice or demand received by courier delivery or electronic communication that is received after 5:00 p.m. (local time for the addressee) shall be deemed to have been received on the next business day.

12.6    Further Assurances.  The parties agree to execute such instructions to the Escrow Holder and the Title Company and such other instruments and to do such further acts as may be reasonably necessary to carry out the provisions of this Agreement.

12.7    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such invalidity or prohibition shall be construed as if such invalid or prohibited provision had not been inserted herein and shall not affect the remainder of such provision or the remaining provisions of this Agreement.

12.8    Interpretation.  The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto.  Paragraph headings of this Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Agreement.  References to "Paragraphs" are to paragraphs of this Agreement, unless otherwise specifically provided.  Unless expressly indicated to the contrary, the terms "include", "includes", "including" and similar terms shall be construed as if followed by the phrase "without limitation".  The terms "person", "party" and "entity" include natural persons, firms, partnerships, limited liability companies, corporations and any other public or private legal entity.  The term "amend" includes modify, supplement, renew, extend, replace, restate and substitute, and the term "amendment" includes modification, supplement, renewal, extension, expansion, replacement, restatement and substitution.  The singular of any word includes the plural, and vice-versa.  The use of any gender includes all genders.  A reference to any specific law, regulation, code, document or agreement includes any future amendments of the law, regulation, code, document or agreement, as the case may be.

12.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the conflicts of law principles of said State.

LEGAL/20893553.3

15

HACLA 002316

134

12.10   <u>Attorneys' Fees</u>.  For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photostatting, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney. If any action be commenced (including an appeal thereof) to enforce any of the provisions of this Agreement or to enforce a judgment, whether or not such action is prosecuted to judgment ("Action"), (i) the unsuccessful party therein shall pay all costs incurred by the prevailing party therein, including reasonable attorneys' fees and costs, court costs and reimbursements for any other expenses incurred in connection therewith, and (ii) as a separate right, severable from any other rights set forth in this Agreement, the prevailing party therein shall be entitled to recover its reasonable attorneys' fees and costs incurred in enforcing any judgment against the unsuccessful party therein, which right to recover post-judgment attorneys' fees and costs shall be included in any such judgment. The right to recover post-judgment attorneys' fees and costs shall (a) not be deemed waived if not included in any judgment, (b) survive the final judgment in any Action, and (c) not be deemed merged into such judgment. The rights and obligations of the parties under this <u>Paragraph 12.10</u> shall survive the termination of this Agreement.

12.11   <u>Successors and Assigns</u>.  Buyer is wholly-owned, directly or indirectly, by Meruelo Maddux Properties, Inc.  Buyer may assign its rights under this Agreement to any entity in which Meruelo Maddux Properties Inc. owns, directly or indirectly, at least a fifty percent (50%) interest.  Except as provided in the previous sentence, Buyer may not assign this Agreement without Seller's consent, which may be granted or withheld in Seller's sole and absolute discretion, and any assignment in violation of the restrictions set forth in this Agreement shall be null and void and of no force or effect.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors, and assigns.

12.12   <u>No Third-Party Beneficiaries</u>.  No third party shall have any rights hereunder.

12.13   <u>Business Days</u>.  If any of the dates specified in this Agreement shall fall on a Saturday, a Sunday or a holiday, then the date of such action shall be deemed to be extended to the next business day.

12.14   <u>Exhibits</u>.  Exhibits <u>A-1</u> through <u>E</u>, inclusive, attached hereto are incorporated herein by reference.

[SIGNATURES ON NEXT PAGE]

HACLA 002317

135

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**SELLER:**

**HOUSING AUTHORITY OF THE CITY OF LOS ANGELES**

By: _____
       Rudolf C. Montiel
       President and CEO

**APPROVED AS TO FORM:**
**ROCKARD J. DELGADILLO,**
**CITY ATTORNEY**

By: _____
Name: Becky Clark, Esq.
Title:  Deputy City Attorney

Date: _____

**BUYER:**

**9901 ALAMEDA, LLC**

By: _____
    Name: _____
    Title: _____

## ACKNOWLEDGEMENT OF RECEIPT AND AGREEMENT OF ESCROW HOLDER

The undersigned acknowledges receipt of this Agreement and agrees to act as Escrow Holder in accordance with the terms of this Agreement.

**CHICAGO TITLE COMPANY**
By: _____
    Authorized Signatory
Date: _____

17

LIBD/2089353.3

HACLA 002318

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE SITE**

PARCEL A:

IN THE RANCHO TAJAUTA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING THAT PORTION OF THE 28.96 ACRE TRACT ALLOTTED TO TOMASA VALENZUELA BY DECREE OF PARTITION OF SAID RANCHO RENDERED IN DISTRICT COURT OF 17 JUDICIAL DISTRICT OF STATE OF CALIFORNIA, IN AND FOR THE COUNTY OF LOS ANGELES, ON SEPTEMBER 12, 1874, AND RECORDED IN BOOK 31 PAGE 154 OF DEEDS, DESCRIBED AS FOLLOWS: BEGINNING AT STATION 6, BEING THE SOUTHEAST CORNER OF SAID TOMASA VALENZUELA TRACT, AS PER MAP FILED IN SUIT FOR PARTITION BEING CASE NO. 1200, DISTRICT COURT ABOVE REFERRED TO; THENCE NORTH 6 DEGREES 20 MINUTES WEST ALONG THE EAST LINE OF TAJAUTA RANCHO, 6.10 CHAINS; THENCE SOUTH 89 DEGREES 10 MINUTES WEST 22.30 CHAINS TO THE EAST LINE OF NERVIO VALENZUELA ALLOTMENT; THENCE SOUTH 5.54 CHAINS ALONG THE EAST LINE OF NERVIO VALENZUELA TRACT AND THE EAST LINE OF THE LAND CONVEYED TO EDWARD B. REED BY DEED RECORDED IN BOOK 181 PAGE 25 OF DEEDS, TO THE SOUTH LINE OF SAID TOMASA VALENZUELA TRACT; THENCE EAST ALONG SAID SOUTH LINE 22.69 CHAINS TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING WITHIN THE LINES OF THAT CERTAIN PARCEL OF LAND MARKED "PERIMETER DESCRIPTION" AS DESCRIBED IN THE FINAL DECREE OF CONDEMNATION ENTERED IN SUPERIOR COURT, LOS ANGELES COUNTY, A CERTIFIED COPY OF WHICH WAS RECORDED ON FEBRUARY 1, 1944, AS DOCUMENT NO. 1340, IN BOOK 20621 PAGE 213 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B:

THAT PORTION OF THE RANCHO SAN ANTONIO, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN DIVIDING LINE BETWEEN RANCHOS TAJAUTA AND SAN ANTONIO, SAID POINT BEING THE SOUTHEAST CORNER OF TOMASA VALENZUELA 28.96 ACRE TRACT HEREINBEFORE DESCRIBED; THENCE EAST AND ALONG THE NORTH BOUNDARY OF LAND NOW OR FORMERLY OWNED BY GEORGE REED 7.15 CHAINS TO THE WEST LINE OF A 30 FOOT ROAD ON THE WEST SIDE OF LOS ANGELES AND SAN PEDRO RAILROAD; THENCE NORTH 10 DEGREES 30 MINUTES WEST ALONG THE WEST SIDE OF SAID ROAD, 6.28 CHAINS; THENCE WEST 6.68 CHAINS TO THE EAST BOUNDARY LINE OF TAJAUTA RANCHO AND THENCE ALONG SAID RANCH LINE SOUTHEASTERLY 6.08 CHAINS TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THE EASTERLY 10 FEET, MEASURED AT RIGHT ANGLES, AS CONVEYED TO THE COUNTY OF LOS ANGELES FOR ROAD PURPOSES BY DEED RECORDED IN BOOK 6141 PAGE 34 OF DEEDS.

PARCEL C:

THAT PORTION OF THE NORTH HALF OF THE 28.96 ACRE TRACT OF LAND IN THE RANCHO TAJAUTA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,

A-1-1

LIBD/2089553.3

HACLA 002319

ALLOTTED TO TOMASA VALENZUELA, BY DECREE OF PARTITION ENTERED IN CASE NO. 1200 OF THE 17TH JUDICIAL DISTRICT COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF LOS ANGELES, A CERTIFIED COPY THEREOF WAS RECORDED ON SEPTEMBER 19, 1874, IN BOOK 31 PAGE 154 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT 165 OF NEVADA VISTA VILLA TRACT, AS SHOWN ON MAP RECORDED IN BOOK 6 PAGE 190 OF MAPS, RECORDS OF SAID COUNTY; SAID POINT OF BEGINNING BEING IN THE SOUTHERLY LINE OF 97TH STREET; THENCE EASTERLY ALONG SAID SOUTHERLY LINE, NORTH 89 DEGREES 12 MINUTES 10 SECONDS EAST 315.04 FEET TO A POINT; THENCE CONTINUING ALONG SAID SOUTHERLY LINE NORTH 89 DEGREES 11 MINUTES 10 SECONDS EAST 1068.61 FEET TO A POINT SAID POINT LYING SOUTH 0 DEGREES 48 MINUTES 50 SECONDS EAST 25 FEET AND NORTH 89 DEGREES 11 MINUTES 10 SECONDS EAST 33.54 FEET FROM THE INTERSECTION OF THE CENTER LINE OF 97TH STREET WITH THE CENTER LINE OF LAUREL STREET SAID POINT BEING ALSO THE TRUE POINT OF BEGINNING FOR THIS DESCRIPTION; THENCE SOUTH 0 DEGREES 48 MINUTES 50 SECONDS EAST TO THE NORTHERLY LINE OF THE LAND DESCRIBED AS PARCEL "A" IN THE DEED TO FINKELSTEIN SUPPLY COMPANY, RECORDED ON MAY 3, 1947 AS INSTRUMENT NO. 964, IN BOOK 24519 PAGE 246 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE EASTERLY LINE OF SAID RANCHO TAJAUTA; THENCE NORTHWESTERLY ALONG SAID EASTERLY LINE TO SAID SOUTHERLY LINE OF 97TH STREET (50 FEET WIDE); THENCE ALONG SAID SOUTHERLY LINE SOUTH 89 DEGREES 11 MINUTES 10 SECONDS WEST TO THE TRUE POINT OF BEGINNING FOR THIS DESCRIPTION.

PARCEL D:

THAT PORTION OF THE RANCHO SAN ANTONIO, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, INCLUDED WITHIN THE FOLLOWING DESCRIBED LINES:

BEGINNING AT THE INTERSECTION OF THE SOUTHERLY LINE OF 97TH STREET, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES RECORDED ON NOVEMBER 27, 1905 AS INSTRUMENT NO. 87, IN BOOK 2523 PAGE 95 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY WITH THE EASTERLY LINE OF THE 28.96 ACRE TRACT OF LAND IN THE RANCHO TAJAUTA, IN SAID COUNTY AND STATE ALLOTTED TO TOMASA VALENZUELA, BY DECREE OF PARTITION ENTERED IN CASE NO. 1200 OF THE 17TH JUDICIAL DISTRICT COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF LOS ANGELES, A CERTIFIED COPY THEREOF WAS RECORDED ON SEPTEMBER 19, 1874, IN BOOK 31 PAGE 154 OF DEEDS, RECORDS OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID EASTERLY LINE TO THE NORTHERLY LINE OF THE LAND DESCRIBED AS PARCEL "B" IN THE DEED TO FINKELSTEIN SUPPLY COMPANY, RECORDED ON MAY 3, 1947 AS INSTRUMENT NO. 964, IN BOOK 24519 PAGE 246 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE WESTERLY LINE OF ALAMEDA STREET, AS ESTABLISHED BY THE FINAL DECREE OF CONDEMNATION ENTERED IN CASE NO. 471285 SUPERIOR COURT, A CERTIFIED COPY THEREOF BEING RECORDED IN BOOK 22452 PAGE 210 OF OFFICIAL RECORDS OF SAID COUNTY AND BY THE DEED TO THE COUNTY OF LOS ANGELES,

LIBD/2069553.3

HACLA 002320

**138**

RECORDED ON MAY 4, 1942, AS INSTRUMENT NO. 778 IN BOOK 19270 PAGE 312 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE NORTHWESTERLY ALONG SAID WESTERLY LINE TO THE SOUTHERLY LINE OF 97TH STREET THENCE WESTERLY ALONG SAID SOUTHERLY LINE TO THE POINT OF BEGINNING.

A-1-3

LIBD/20355393

HACLA 002321

**139**

**EXHIBIT A-2**

**DEPICTION OF THE LAND**

[See the attached]

LIBD/20105553.3

A-2-1

HACLA 002322

140

Case 2:11-cv-01626-FMO-CW   Document 151-2   Filed 12/26/11   Page 48 of 70   Page ID #:2223



Not
Subject
to The
Option

HACLA 002323

141

**EXHIBIT A-3**

**SITE PLAN**

[See the attached]

A-3-1

LIBD/2069553.1

HACLA 002324

**142**



HACLA 002325

**143**

**EXHIBIT A-4**

**ALTERNATE SITE PLAN**

[See the attached]

A-4-1

LIBD/2089583.3

HACLA 002326

**144**



HACLA 002327

**145**

## EXHIBIT B

## LEASE AND GUARANTIES AND SECURITY INSTRUMENTS

Lease

1.     AIR Standard Industrial/Commercial Single-Tenant Lease – Net dated for reference purposes May 15, 1999, and executed June 3, 1999, between Shama, LLC, as "Lessor," and Columbia Steel, LLC, as lessee, as amended by:

- Lease Modification and Cure Agreement dated January 27, 2000, between Lessor and Cambridge Steel, LLC (formerly known as Columbia Steel, LLC), and countersigned by Guarantors (as defined below).

- Assignment and Assumption of Lease, dated as of the latest date of execution on March 9, 2001, between Lessor, Cambridge Steel, LLC, as assignor, and Lex West, LLC, as assignee, and countersigned by Guarantors.

- Landlord's Agreement dated March 9, 2001, between Lessor and La Salle Bank National Association.

Guaranties and Security Instruments

2.     Guaranty of Lease dated June 3, 1999, by Thomas K. Skinker, Merrill G. Bodily and Paul Jaeckel ("Guarantors").

3.     Deed of Trust dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

4.     Deed of Trust with Assignment of Rents dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

5.     Guaranty of Lease dated March 9, 2001, by Lexington Steel, Inc.

LIBD/20895553.3

HACLA 002328

146

## EXHIBIT C

## FORM OF DEED

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

_____

_____

Attention: _____

MAIL TAX STATEMENT TO:

_____

_____

Attention: _____

(Space Above Line for Recorder's Use Only)

## GRANT DEED

APNs 6046-019-002, 6046-019-003, 6046-019-004

In accordance with Section 11932 of the California Revenue and Taxation Code, Grantor has declared the amount of the transfer tax that is due by a separate statement which is not being recorded with this Grant Deed.

FOR VALUE RECEIVED, the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Grantor"), grants to _____, a _____ ("Grantee"), all that certain real property situated in the County of Los Angeles, State of California, described on Exhibit A attached hereto and by this reference incorporated herein (the "Property").

TO HAVE AND TO HOLD the Property with all the rights, privileges and appurtenances thereto belonging, or in any way appertaining, unto the said Grantee and Grantee's successors and assigns.

SUBJECT TO the following:

(a)     All liens, encumbrances, easements, covenants, conditions, restrictions and other matters of record; and

LIBD/2019553.3

C-1

HACLA 002329

147

(b)    A lien not yet delinquent for real property taxes and any general or special assessments against the Property.

[RESERVE EASEMENT, IF APPLICABLE]

Dated: _____, 2008

GRANTOR:                                    HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

                                            By: _____
                                                Name: _____
                                                Title: _____

APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY

By: _____
Name:  Becky Clark, Esq.
Title:   Deputy City Attorney

Date: _____

LBD/20695333                          C-2

HACLA 002330

**EXHIBIT D**

**FORM OF BILL OF SALE AND ASSIGNMENT**

THIS BILL OF SALE AND ASSIGNMENT is made as of this _____ day of _____, 2008, by the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Seller"), in favor of _____, a _____ ("Buyer").

**RECITALS**

A.      Seller and Buyer have entered into that certain Option Agreement and Joint Escrow Instructions dated as of [March 31], 2008 ("Sale Agreement").

B.      The Sale Agreement provides, among other things, that Seller shall convey and assign its interest in certain personal property to Buyer. All initially-capitalized terms used, but not defined herein have the meanings given such terms in the Sale Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby bargains, sells, conveys, assigns and transfers to Buyer, all of Seller's right, title and interest in and to the Personal Property and the Intangible Property.

Seller hereby represents and warrants to Buyer that Seller has not encumbered or otherwise conveyed any of the Personal Property or the Intangible Property. The property transferred hereby is transferred "AS IS", "WHERE IS", and without any representation or warranty whatsoever except as otherwise provided herein.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale and Assignment as of the day and year first above written.

SELLER:                              HOUSING AUTHORITY OF THE CITY OF LOS
                                     ANGELES

                                     By: _____
                                         Name: _____
                                         Title: _____

APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY

By: _____
Name:  Becky Clark, Esq.
Title:   Deputy City Attorney

Date: _____

                                     D-1

LIBD/2069553.3

HACLA 002331

**149**

EXHIBIT E

FORM OF ASSIGNMENT AND ASSUMPTION

ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of _____, 2008 by and between the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, Assignor and Assignee have entered into that certain Option Agreement and Joint Escrow Instructions dated as of [March 31], 2008 ("Sale Agreement"); and

WHEREAS, the Sale Agreement provides, among other things, that Assignor shall assign to Assignee a certain lease and Assignee shall assume all of the obligations of Seller under such lease from and after the date of such assignment, and that Assignor and Assignee shall enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.   Assignment of Lease.  Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under the lease listed in Exhibit A attached hereto and incorporated herein by this reference, together with any guaranties and security instruments relating thereto ("Lease").  Assignee hereby assumes the landlord's obligations under the Lease that accrue from and after the Closing (as defined in the Sale Agreement).

2.   Attorneys' Fees.  If either party hereto brings any action or suit against the other party hereto by reason of any breach of any provision of this Agreement on the part of the other party, the prevailing party shall be entitled to recover from the other party all costs and expenses of the action or suit, including reasonable attorneys' fees, charges and costs, in addition to any other relief to which it may be entitled.

3.   GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO THE CONFLICT-OF-LAW RULES AND PRINCIPLES OF SAID STATE.

4.   Successors and Assigns.  This Agreement shall apply to and bind the successors and assigns of the parties hereto.

5.   Captions.  The marginal headings or titles to the sections and paragraphs of this Agreement and the title of this instrument are not part of the Agreement but are inserted for convenience only and shall have no effect upon the construction or interpretation of any part of this Agreement.

LIBD/2089553.3

E-1

HACLA 002332

6.      Amendments. No provision of this Agreement may be amended, changed or waived except by a written instrument signed by Assignee and by Assignor (or, in the case of a waiver, by the party against whom enforcement of the waiver is sought).

7.      Further Acts. Each party, upon the request of the other, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.

ASSIGNOR:                                HOUSING AUTHORITY OF THE CITY OF
                                         LOS ANGELES

                                         By: _____
                                             Rudolf C. Montiel
                                             President and CEO


APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY


By: _____
Name: Becky Clark, Esq.
Title:  Deputy City Attorney

Date: _____

ASSIGNEE:                                9901 ALAMEDA, LLC


                                         By: _____
                                             Name: _____
                                             Title: _____

HACLA 002333

## EXHIBIT D

### PROPERTY DOCUMENTS

1. The Master Purchase Agreement:

   - Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate dated August 19, 2003 executed by Harbor Town, LLC, as buyer.

   - Counter-Offer dated June 1, 2004 between Shama, LLC, as seller, and Harbor Town, LLC, as buyer.

   - Escrow Instructions to Commerce Escrow Company dated June 18, 2004 from Shama, LLC and Harbor Town, LLC.

   - Amendment to Escrow dated June 18, 2004 between Shama, LLC, as seller, and Seller, as buyer (in substitution of Harbor Town, LLC).

2. Notice of Entry of Judgment in LASC Case No. BC323975 (ordering specific performance of the Master Purchase Agreement).

3. Preliminary Title Report dated as of March 15, 2008 prepared by the Title Company.

4. ALTA/ASCM Land Title Survey dated July 22, 2004 prepared by O.K.O. Engineering Inc.

5. The Lease and related guaranties and security instruments:

   - AIR Standard Industrial/Commercial Single-Tenant Lease -- Net dated for reference purposes May 13, 1999, and executed June 3, 1999, between Shama, LLC, as "Lessor," and Columbia Steel, LLC, as lessee.

   - Guaranty of Lease dated June 3, 1999, by Thomas K. Skinker, Merrill G. Bodily and Paul Jaeckel ("Guarantors").

   - Deed of Trust dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

   - Deed of Trust with Assignment of Rents dated June 2, 1999 made by Merrill G. Bodily and Tawna B. Bodily in favor of Shama, LLC.

   - Lease Modification and Cure Agreement dated January 27, 2000, between Lessor and Cambridge Steel, LLC (formerly known as Columbia Steel, LLC), and countersigned by Guarantors.

D-1

2083399-5

- Assignment and Assumption of Lease, dated as of the latest date of execution on March 9, 2001, between Lessor, Cambridge Steel, LLC, as assignor, and Lex West, LLC, as assignee, and countersigned by Guarantors.

- Guaranty of Lease dated March 9, 2001, by Lexington Steel, Inc.

- Landlord's Agreement dated March 9, 2001, between Lessor and La Salle Bank National Association.

6.   Rent Statement dated February 26, 2008.

7.   Phase I Environmental Site Assessment dated August 24, 2004 by Environmental Geoscience Services.

8.   Phase I Environmental Site Assessment and Selected Soil Sampling dated February 9, 1996 by The Mark Group, Inc.

9.   Phase II Environmental Site Assessment Report dated September 16, 2005 by RCC Group, LLC.

10.   Letter from Clean Harbors Environmental Services regarding Budgetary Estimate – Remedial Activities at 9901 South Alameda Street Property.

D-2

HACLA 002335

**EXHIBIT E**

**PRO FORMA POLICY**

E-1

2080399-5

HACLA 002336

154

**EXHIBIT F**

**FORM OF DEED**

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

_____

_____

Attention: _____

(Space Above Line for Recorder's Use Only)

Recording of this document is fee exempt
under Government Code Section 6103.
No Documentary Transfer Tax is due on
this document pursuant to Revenue and
Taxation Code Section 11922.

**GRANT DEED**

APNs 6046-019-002, 6046-019-003, 6046-019-004

FOR VALUE RECEIVED, 9901 ALAMEDA, LLC, a California limited liability company ("Grantor"), grants to the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Grantee"), all that certain real property situated in the County of Los Angeles, State of California, described on Exhibit A attached hereto and by this reference incorporated herein (the "Property").

TO HAVE AND TO HOLD the Property with all the rights, privileges and appurtenances thereto belonging, or in any way appertaining, unto the said Grantee and Grantee's successors and assigns.

SUBJECT TO the following:

(a) All liens, encumbrances, easements, covenants, conditions, restrictions and other matters of record; and

(b) A lien not yet delinquent for real property taxes and any general or special assessments against the Property.

Dated: _____, 2008

F-1

2069399-5

HACLA 002337

**155**

GRANTOR:                         9901 ALAMEDA, LLC

                                 By: _____
                                    Name: _____
                                    Title: _____

2089399-5                        F-2

HACLA 002338

156

Certificate of Acceptance

This is to certify that the interest in real property ("Property") located at 9901 S. Alameda Street, Los Angeles County, California and conveyed by the attached grant deed to the Housing Authority of the City of Los Angeles (the "Authority"), a public body, corporate and politic, is hereby accepted by the undersigned officer of the Authority under Resolution # _____ pursuant to action taken by the Board of Commissioners of the Housing Authority of the City of Los Angeles on March 26, 2008 authorizing the Authority to take title to the property and the Grantee consents to the recordation thereof.

Date: _____

Housing Authority of the City of Los Angeles

By: _____

Rudolf C. Montiel
President and CEO

2089399-5

F-3

HACLA 002339

157

## EXHIBIT G

## FORM OF BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT is made as of this ____ day of _____, 2008, by 9901 ALAMEDA, LLC, a California limited liability company, ("Seller"), in favor of the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Buyer").

### RECITALS

A.    Seller and Buyer have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of March 26, 2008 ("Sale Agreement").

B.    The Sale Agreement provides, among other things, that Seller shall convey and assign its interest in certain personal property to Buyer. All initially-capitalized terms used but not defined herein have the meanings given such terms in the Sale Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby bargains, sells, conveys, assigns and transfers to Buyer, all of Seller's right, title and interest in and to the Personal Property and the Intangible Property.

Seller hereby represents and warrants to Buyer that Seller has not encumbered or otherwise conveyed any of the Personal Property or the Intangible Property. The property transferred hereby is transferred "AS IS", "WHERE IS", and without any representation or warranty whatsoever except as otherwise provided herein.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale and Assignment as of the day and year first above written.

SELLER:                         9901 ALAMEDA, LLC,
                                a California limited liability company

                        By:     _____
                                Name: _____
                                Title: _____

-2089399-5

G-1

HACLA 002340

**EXHIBIT H**

**FORM OF ASSIGNMENT AND ASSUMPTION**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of _____, 2008 by and between 9901 ALAMEDA, LLC, a California limited liability company ("Assignor"), and the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Assignee").

WHEREAS, Assignor and Assignee have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of March 26, 2008 ("Sale Agreement"); and

WHEREAS, the Sale Agreement provides, among other things, that Assignor shall assign to Assignee a certain lease and Assignee shall assume all of the obligations of Seller under such lease from and after the date of such assignment, and that Assignor and Assignee shall enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. **Assignment and Assumption of Lease.** Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under the lease listed in Exhibit A attached hereto and incorporated herein by this reference, together with any guaranties and security instruments relating thereto ("Lease"). Assignee hereby assumes the landlord's obligations under the Lease that accrue from and after the Closing (as defined in the Sale Agreement).

2. **Attorneys' Fees.** If either party hereto brings any action or suit against the other party hereto by reason of any breach of any provision of this Agreement on the part of the other party, the prevailing party shall be entitled to recover from the other party all costs and expenses of the action or suit, including reasonable attorneys' fees, charges and costs, in addition to any other relief to which it may be entitled.

3. **GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO THE CONFLICT-OF-LAW RULES AND PRINCIPLES OF SAID STATE.

4. **Successors and Assigns.** This Agreement shall apply to and bind the successors and assigns of the parties hereto.

5. **Captions.** The marginal headings or titles to the sections and paragraphs of this Agreement and the title of this instrument are not part of the Agreement but are inserted for convenience only and shall have no effect upon the construction or interpretation of any part

H-1

2089359-5

of this Agreement.

6. **Amendments.** No provision of this Agreement may be amended, changed or waived except by a written instrument signed by Assignee and by Assignor (or, in the case of a waiver, by the party against whom enforcement of the waiver is sought).

7. **Further Acts.** Each party, upon the request of the other, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.

**ASSIGNOR:**                          **9901 ALAMEDA, LLC**

                                       By: _____
                                           Name: _____
                                           Title: _____

**ASSIGNEE:**                          **HOUSING AUTHORITY OF THE CITY OF LOS ANGELES**

                                       By: _____
                                           Rudolf C. Montiel
                                           President and CEO

**APPROVED AS TO FORM:**
**ROCKARD J. DELGADILLO,**
**CITY ATTORNEY**


By: _____
Name: Becky Clark, Esq.
Title: Deputy City Attorney

Date: _____


H-2

2089399-5

HACLA 002342

160

## EXHIBIT I

### CERTIFICATE OF NON-FOREIGN STATUS

9901 Alameda, LLC, a California limited liability company ("Seller"), is the transferor of that certain real property located in and more particularly described on Exhibit A attached hereto (the "Property").

Section 1445 of the Internal Revenue Code of 1986 (the "Code") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax will not be required in connection with the disposition of the Property pursuant to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of March 26, 2008, by and between Seller and the Housing Authority of the City of Los Angeles, a public body, corporate and politic, the undersigned certifies the following on behalf of Seller:

1. Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Code and the regulations promulgated thereunder;

2. Seller is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3. Seller's U.S. employer identification number is _____; and

4. Seller's address is 761 Terminal Street, Building 1, Second Floor, Los Angeles, California 90021.

It is understood that this certificate may be disclosed to the Internal Revenue Service and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this foregoing certification and, to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.

Date: _____, 2008     Signature: _____

2089399-5

I-1

HACLA 002343

161

**EXHIBIT J**

**FORM OF MEMORANDUM**

RECORDING REQUESTED BY:

AND WHEN RECORDED, RETURN TO:

_____
_____
_____
_____

## MEMORANDUM OF PURCHASE OPTION

THIS MEMORANDUM OF PURCHASE OPTION (this "Memorandum") is made as of _____, 2008 by and between the HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, a public body, corporate and politic ("Optionor"), and 9901 ALAMEDA, LLC, a California limited liability company ("Optionee"), with reference to the following facts:

A.  Optionor owns that certain real property located in Los Angeles County, California more particularly described on Exhibit A hereto (the "Site").

B.  Pursuant to that certain unrecorded Option Agreement and Joint Escrow Instructions dated as of even date therewith between Optionor and Optionee (the "Option Agreement"), Optionor has granted Optionee an option to purchase (the "Purchase Option") the portion of the Site depicted on Exhibit B hereto (the "Property").

C.  Optionor and Optionee desire to provide notice to third parties that the Property is subject to the Purchase Option.

NOW, THEREFORE, with reference to the foregoing Recitals and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Optionor and Optionee hereby agree as follows:

1.  Optionee shall have, and Owner hereby grants to Optionee, an option to purchase the Property on the terms and subject to the conditions set forth in the Option Agreement.

2.  The Purchase Option shall expire and terminate and be of no further force or effect on September 30, 2009. Without limiting the foregoing, upon the automatic or any earlier termination of the Purchase Option pursuant to the Option Agreement, each of Optionor and Optionee agrees to execute, acknowledge and record an instrument reflecting the expiration and termination of the Purchase Option.

J-1

2083399-5

HACLA 002344

**162**

3.      All of the terms, conditions and agreements contained in the Option Agreement are fully incorporated herein by reference as if fully set forth herein. This Memorandum is not intended to change any of the terms of the Option Agreement.

4.      This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Purchase Option as of the date first set forth above.

OPTIONOR:                                HOUSING AUTHORITY OF THE CITY
                                         OF LOS ANGELES

                                         By: _____
                                             Name: _____
                                             Its: _____

OPTIONEE:                                9901 ALAMEDA, LLC

                                         By: _____
                                             Name: _____
                                             Its: _____

APPROVED AS TO FORM:
ROCKARD J. DELGADILLO,
CITY ATTORNEY


By: _____
Name: Becky Clark, Esq.
Title:  Deputy City Attorney

Date: _____

J-2

2089399-5

HACLA 002345

163

## PROOF OF SERVICE

I am employed in Los Angeles County. I am over the age of 18 and not a party to this action. My business address is 1055 West Seventh Street, 24th Floor, Los Angeles, California 90017.

On October 4, 2013, I served the foregoing document, described as **"FIFTH AMENDED COMPLAINT FOR: 1) COST RECOVER (42U.S.C.A § 9607); 2) CONTRIBUTION AND/OR INDEMNITY (CLAIFORNIA HEALTH & SAFETY CODE § 25363, SUBD.(e)); 3) PRIVATE NUISANCE (CALIFORNIA CIVIL CODE § 3479); 4) TRESPASS; 5) NEGLIGENCE; 6) DECLARATORY RELIEF AND 7) NEGLIGENT MISREPRESENTATION"** in this action by placing ☐ the original of the document ☒ true copies of the document in separate sealed envelopes to the following addresses:

### SEE ATTACHED SERVICE LIST

☒ **BY U.S. MAIL** I deposited such envelope in the mail at Los Angeles, California. The envelopes were mailed with postage thereon fully prepaid. I am "readily familiar" with Morris Polich & Purdy LLP's practice of collection and processing correspondence for mailing. Under that practice documents are deposited with the U.S. Postal Service on the same day as is stated in this Proof of Service, with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date stated in this Proof of Service.

☐ **BY FEDERAL EXPRESS** I am familiar with the firm's practice of collecting and processing correspondence for delivery via Federal Express. Under that practice, it would be picked up by Federal Express on that same day at Los Angeles, California and delivered to the parties as listed on this Proof of Service the following business morning.

☒ **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 4, 2013, at Los Angeles, California.

_____

*Christine Delgado*

## SERVICE LIST

### *HACLA v. PCC Technical Industries, Inc., et al.*

| | |
|---|---|
| Dennis M.P. Ehling<br>Cheryl S. Chang<br>Elizabeth B. Kim<br>BLANK ROME LLP<br>1925 Century Park East, Suite 1900<br>Los Angeles, CA  90067<br>(424) 239-3423 / Fax: (424) 239-3480 | *Attorneys for*<br>*PCC TECHNICAL INDUSTRIES, INC.;*<br>*GK TECHNLOGIES, INC.* |
| Greg A. Christianson<br>BINGHAM MCCUTCHEN<br>355 South Grand Avenue, Suite 4400<br>Los Angeles, CA 90071<br>(213) 680-6620 / Fax: (213) 680-6499 | *Attorneys for*<br>*CASCADE STEEL ROLLING MILLS, INC.* |
| Albert M. Cohen<br>Jennifer A. Jason<br>Nancy M. Lee<br>LOEB & LOEB<br>10100 Santa Monica Boulevard<br>Suite 2200<br>Los Angeles, CA  90067<br>(310) 282-2228 / Fax: (310) 282-2200 | *Attorneys for*<br>*BECKER BROS. STEEL SUPPLY CO;*<br>*SHAMA, A GENERAL PARTNERSHIP;*<br>*SHAMA, LLC.* |
| John D. Dwyer<br>Leslie A. Sheehan<br>GORDON & REES LLP<br>633 West Fifth Street, 52nd Floor<br>Los Angeles, CA  90071<br>(213) 576-5000 / Fax: (213) 680-4470 | *Attorneys for*<br>*APL LIMITED* |
| David F. Wood<br>Emil A. Macasinag<br>WOOD SMITH HENNING & BERMAN LLP<br>10960 Wilshire Boulevard, 18th Floor<br>Los Angeles, CA  90024-3804<br>(310) 481-7600 / Fax (310) 481-7650 | *Attorneys for*<br>*PACER INTERNATIONAL, INC.* |
| Ruben A. Castellon<br>William W. Funderburk<br>Alastair Hamblin<br>CASTELLON & FUNDERBURK LLP<br>811 Wilshire Boulevard, Suite 1025<br>Los Angeles, CA  90017<br>(213) 623-7515 / Fax: (213) 532-3984 | *Attorneys for*<br>*GARY WEISENBERG, SOPHIE*<br>*WEISENBERG, DORIS SEBULSKY.*<br>*S&W ATLAS IRON & METAL CO.,*<br>*INC. and 10019 S. ALAMEDA LLC* |
| David C. Scheper<br>Gregory Andrew Ellis<br>Scheper Kim & Harris LLP<br>601 West 5th Street 12th Floor<br>Los Angeles, CA  90071-2025<br>(213) 613-4655/ Fax (213) 613-4656 | *Attorneys for*<br>*ENERFAB, INC.* |

| | |
|---|---|
| Kevin P. Braig<br>DINSMORE & SHOHL, LLP<br>1100 Courthouse Plaza SW<br>10 North Ludlow Street<br>Dayton, OH 45402<br>(937) 449-6456/ Fax (937) 449-2834 | *Attorneys for*<br>*ENERFAB, INC.* |
| Kevin J. McNaughton<br>Jill A. Franklin<br>SCHAFFER, LAX, MCNAUGHTON & CHEN<br>515 South Figueroa, Suite 1400<br>Los Angeles, CA 90071<br>(213) 337-1000/ Fax (213) 337-1010 | *Attorneys for*<br>*LEX WEST, LLC and LEXINGTON*<br>*STEEL CORPORATION* |
| David C. Bolstad<br>Safarian Choi & Bolstad LLP<br>555 S. Flower Street, Suite 650<br>Los Angeles, CA 90071<br>Phone: 213-481-6565<br>dbolstad@safarianchoi.com | *Attorneys for*<br>*9901 ALAMEDA LLC and John Maddux* |
| Steven B. Kotulak<br>Joseph M. Walsh, Jr.<br>IVES KIRWAN & DIBBLE<br>660 S. Figueroa Street, Suite 1990<br>Los Angeles, CA 90017<br>(213) 627-0113 / Fax: (213) 627-1545 | *Attorneys for*<br>*BLUE TEE CORPORATION dba*<br>*BROWN STRAUSS STEEL* |
| David K. Haber<br>Sage R. Knauft<br>Walsworth Franklin Bevins & McCall<br>LLP<br>One City Blvd., 5th Floor<br>Orange, CA 92868-3677<br>(714) 634-2522 / Fax: (714) 634-0686 | *Attorneys for*<br>*ESTATE OF LESTER M.*<br>*FINKELSTEIN, DECEASED; ESTATE*<br>*OF RUBEN FINKELSTEIN,*<br>*DECEASED; FINKELSTEIN*<br>*FOUNDATION, LESTER RUBEN*<br>*CORPORATION NO. 1, LESTER*<br>*RUBEN CORPORATION NO. 2, and*<br>*LESTER RUBEN CORPORATION NO.*<br>*3* |
| Robert Rosen, Esq.<br>John B. Wallace, Esq.<br>Rosen & Associates, P.C.<br>444 S. Flower Street, Ste 3010<br>Los Angeles, CA 90071<br>(213) 362-1000 / Fax: (213) 362-1001 | *Attorneys for*<br>*RICHARD MERUELO* |
| Brian M. Ledger, Esq.<br>Gordon & Rees, LLP<br>101 W. Broadway, Suite 2000<br>San Diego, CA 92101<br>(619) 969-6700/Fax: (619)696-7124<br>bledger@gordonrees.com | *Attorneys for*<br>*SOUTHWEST STEEL ROLLING*<br>*MILLS, INC. and APL LIMITED* |