**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOUSING AUTHORITY OF THE CITY OF LOS ANGELES,<br><br>            Plaintiff,<br><br>       v.<br><br>PCC TECHNICAL INDUSTRIES, INC., <u>et al.</u>,<br><br>            Defendants. | Case No. 11-1626 FMO (CWx)<br><br><br><br>**ORDER RE: HACLA'S MOTION FOR SUMMARY JUDGMENT** |

The court has reviewed and considered all the briefing filed with respect to the Motion for Summary Judgment or, Alternatively, Summary Adjudication ("Motion") filed by the Housing Authority of the City of Los Angeles ("HACLA") against: Lester Ruben Corporation No. 1 f/k/a Southwest Steel Rolling Mills, Inc. ("Old Southwest Steel"), Lester Ruben Corporation No. 2 f/k/a Economy Steel Construction Co., Inc., Lester Ruben Corporation No. 3 f/k/a Economy Steel Construction Company of California, the Finkelstein Foundation, Estate of Lester M. Finkelstein, Deceased, Estate of Ruben Finkelstein, Deceased (collectively, the "Finkelstein entities"); PCC Technical Industries, Inc. ("PCC Tech"); and Southwest Steel Rolling Mills, Inc. ("New Southwest Steel") (collectively, "defendants"). The court concludes that oral argument is not necessary to resolve the Motion and orders as follows. <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15; <u>Willis v. Pac. Mar. Ass'n</u>, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

## BACKGROUND

This action stems from environmental contamination involving a 21.1-acre property located at 9901 S. Alameda Street in the City of Los Angeles (the "Site").  (See Fifth Amended Complaint ("5AC"), Dkt. No. 360, at ¶ 36).  HACLA, current owner of the Site, (see id. at ¶ 37), filed this action against defendants under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9600 et seq.  (See id. at ¶¶ 52-58).

## STATEMENT OF FACTS[1]

From January 1938 until October 1969, the Finkelstein entities[2] owned the Site.[3]  (See SOUF, Dkt. No. 615, at P4-P22; Evid. App'x, Dkt. No. 615, Exhs. 2 (January 1938 grant deed to Finkelstein Foundry Supply Company, Inc.), 8 (October 1969 grant deed to Automation Industries,

---

[1]  Unless otherwise indicated, the following facts are undisputed.  In addition, to the extent the court relies on evidence objected to by the parties, their objections are overruled.

[2]  The Finkelstein entities who owned the Site consist of the following:  the Finkelstein Foundry Supply Company; the Finkelstein Supply Company; Southwest Steel Rolling Mills, Inc. ("Old Southwest Steel"), now known as Lester Ruben Corporation No. 1; Clearview Development Co., Inc., Prudential Equipment Co., Inc., and the Finkelstein Foundation.  (See Joint Evidentiary Appendix Regarding Housing Authority of the City of Los Angeles's Motion for Summary Judgment or, Alternatively, Summary Adjudication ("Evid. App'x"), Dkt. No. 615, Exhibits ("Exhs.") 2 (grant deed to Finkelstein Foundry Supply Co.), 3 (grant deed to Finkelstein Supply Co.), 4 (grant deed to Old Southwest Steel), 5 (executrix deed to Clearview Development Co., Inc.), 6 (grant deed to Prudential Equipment Co., Inc.) & 7 (grant deed to Finkelstein Foundation); id., Exhibit ("Exh.") 16 (Certificate of Amendment of Articles of Incorporation of Old Southwest Steel changing name to Lester Ruben Corporation No. 1).  HACLA alleges that the Estate of Lester M. Finkelstein, Deceased, and Estate of Ruben Finkelstein, Deceased, ("Finkelstein estates") also owned the Site.  (See Joint Memorandum of Points and Authorities Regarding Plaintiff's Motion for Summary Judgment/Adjudication ("Joint Br."), Dkt. No. 615, at 5-6).  Lester M. Finkelstein and Ruben Finkelstein were partners in Finkelstein Supply Company, which held title to the south portion of the Site from May 1947 until December 1951.  (See Evid. App'x, Dkt. No. 615, Exh. 3) (May 3, 1947, grant deed to Finkelstein Supply Company, "a partnership composed of Lester M. Finkelstein and Ruben Finkelstein[.]").  Defendants do not dispute the Finkelstein estates' ownership of the Site.  (See Statement of Uncontroverted Facts ("SOUF"), Dkt. No. 615, at P30-P31; see, generally, Joint. Br., Dkt. No. 615).

[3]  The Finkelstein Foundry Supply Company, the Finkelstein Supply Company, and Old Southwest Steel owned the 17-acre southern portion of the Site, (see SOUF, Dkt. No. 615, at P3 & P4), from 1938 until 1955, when the Finkelstein entity Clearview Development Company, Inc. obtained ownership of the approximately 4-acre north-northeast portion of the Site.  (See id. at P2 & P17).

Inc. of south portion of Site) & 22 (October 1969 grant deed to Automation Industries, Inc. of north-northeastern portion of Site)).   During that time, the Finkelstein entities[4] operated a steel mill at the Site.   (See SOUF, Dkt. No. 615, at P48, P60, P78, P96, P99 & P100; Evid. App'x, Dkt. No. 615, Exhs. 27-33 (Finkelstein entities' Responses to HACLA's Interrogatories) at No. 2).

On October 23, 1969, Old Southwest Steel transferred the Site to Automation Industries, Inc. ("Automation"), (see SOUF, Dkt. No. 615, at P34-P35; Evid. App'x, Dkt. No. 615, Exhs. 8 (grant deed to Automation of south portion of Site) & 22 (grant deed to Automation of north-northeastern portion of Site)) – now known as PCC Tech.   (See Evid. App'x, Dkt. No. 615, Exh. 15) (Certificate of Amendment of Articles of Incorporation changing name to PCC Tech).

New Southwest Steel – a subsidiary of Automation, (see Evid. App'x, Exh. 25 (deposition of Gerald Bomstad [former Automation officer]) ("Bomstad Depo.") at 97) – took up the Site's steel mill operations in 1969.   (See id., Exh. 34 (New Southwest Steel's Responses to HACLA's Interrogatories) at No. 2; id., Exh. 48 (Finkelstein Depo.), Exh. 170 thereto (Finkelstein Decl.) at ¶ 23 (describing operations of New Southwest Steel as continuation of Old Southwest Steel)).   In late 1975, New Southwest Steel shut down its operations.   (See id., Exh. 49 (deposition of David S. Campbell [New Southwest Steel employee]) ("Campbell Depo.") at 67-68).

---

[4]   The Finkelstein entities who operated steel mills at the Site include: Old Southwest Steel, Economy Steel Construction, and Economy Steel of California, now known, respectively, as Lester Ruben Corporations Nos. 1-3.   (See SOUF, Dkt. No. 615, P48, P60 & P78); (Evid. App'x, Dkt. No. 615, Exhs. 16, 18 & 20) (certificates of amendment of articles of incorporation changing entity names).   Economy Steel Construction received reinforcing bar from Old Southwest Steel and cut it to length, shaped and bundled it for sale.   (See Evid. App'x, Dkt. No. 615, Exh. 48 (deposition of Leland Finkelstein [employee of Finkelstein entities and New Southwest Steel]) ("Finkelstein Depo.") at 231-32).   Economy Steel of California purchased reinforcing bar, structural steel, and new steel produced by Old Southwest Steel, and worked on construction sites to install the reinforcing bar and concrete.   (See id. at 126 & 232).   HACLA alleges the estates of Ruben and Lester Finkelstein were operators at the Site because: Lester and Ruben Finkelstein were partners and owners of the Finkelstein Supply Company, (see id., Exh. 3) (grant deed to Finkelstein Supply Company, "a partnership composed of Lester M. Finkelstein and Ruben Finkelstein[.]"), which bought, processed and sold scrap metal at the Site, (see id., Exh. 48 (Finkelstein Depo.) at 35 & 65-66), and both were on the Site on a regular basis.   (See id., Exh. 170 thereto (Declaration of Leland Finkelstein) ("Finkelstein Decl.") at ¶ 9).   The Finkelstein entities do not dispute that the Finkelstein estates were operators at the Site.   (See SOUF, Dkt. No. 615, at P96 & P 99; see, generally, Joint Br., Dkt. No. 615).

On January 8, 1976, Automation transferred ownership of the Site to New Southwest Steel. (See Evid. App'x, Dkt. No. 615, Exh. 25 (Bomstad Depo.) at 136-138 & Exh. 198 thereto (grant deed from Automation to New Southwest Steel)).  The following day, New Southwest Steel transferred the Site to Cascade Steel Rolling Mills ("Cascade").  (See id., Exh. 10) (grant deed from New Southwest Steel to Cascade).  New Southwest Steel leased its steel mill equipment to Cascade for its operations on the Site from December 31, 1975, until September 30, 1976.  (See id., Exh. 25 (Bomstad Depo.) at 131-133 & Exh. 197 thereto (New Southwest Steel and Cascade sales agreement) at § 1(b) & Annex 4).

On September 30, 1976, Cascade transferred the Site to Automation Leasing Corp., an a/k/a of New Southwest Steel.  (See Evid. App'x, Dkt. No. 615, Exhs. 11 (grant deed from Cascade to Automation Leasing Corp.) & 12 (Certificate of Amendment of Articles of Incorporation of New Southwest Steel changing name to Automation Industrial Leasing Corp.) at 2-3).  On March 16, 1979, New Southwest Steel transferred ownership of the Site to Shama, a General Partnership ("Shama, GP").  (See id., Exh. 14) (grant deed from New Southwest Steel to Shama, GP).

The steel rolling mill operations at the Site involved purchasing and storing scrap metal, and then melting and processing it to form goods such as merchant bar angles, channels, rebars and rails.  (See Evid. App'x, Dkt. No. 615, Exh. 48 (Finkelstein Depo.), Exh. 170 thereto (Finkelstein Decl.) at ¶¶ 11 & 13); (see also id., Exh. 40 (Engineering Study of Kadlec Engineering [expert retained by HACLA] regarding Site's steel mill operations) ("Kadlec Report") at 16) (summarizing evidence related to steel mill operations on Site).  By no later than 1952, the operations on the Site involved at least one Electric Arc Furnace ("EAF"), and a second was installed within two to three years.  (See SOUF, Dkt. No. 615, at P103-P104; Evid. App'x, Dkt. No. 615, Exh. 48 (Finkelstein Depo.) at 42 & 59-60).  The Finkelstein entities and New Southwest Steel used the EAFs throughout the time they operated the steel mill on the Site.  (See SOUF, Dkt. No. 615, at P105 & P134); (Evid. App'x, Dkt. No. 615, Exh. 48 (Finkelstein Depo.) at 108); (id., Exh 48, Exh. 7 thereto at 155-56) (Oct. 27, 1969, Automation press release regarding purchase of Site, describing Old Southwest Steel as "operating two electric furnaces").

1    Use of EAFs at the Site produced slag, a byproduct containing impurities of the melted

2    scrap metal that was separated from the steel used to form goods.  (See SOUF, Dkt. No. 615, at

3    P106); (Evid. App'x, Dkt. No. 615, Exh. 48 (Finkelstein Depo.) at 45-48); (id., Exh. 49 (Campbell

4    Depo.) at 88); (see also id., Exh. 40 (Kadlec Report) at 8) ("The slag formation is a natural

5    byproduct of the EAF system.").  The Finkelstein entities and, later, New Southwest Steel, placed

6    slag on the soil at the Site.  (See SOUF, Dkt. No. 615, at P107, P114 & P126; Evid. App'x, Dkt.

7    No. 615, Exh. 48 (Finkelstein Depo.) at 50-51; id., Exh. 49 (Campbell Depo.) at 32).  In December

8    1954, Old Southwest Steel estimated its production of slag to be 500-1000 tons per month.  (See

9    id., Exh. 48 (Finkelstein Depo.) at 143-44); (id., Exh. 21 thereto at § (b)) (December 20, 1954,

10   Request for Industrial Waste Disposal Permit estimating that "[t]he quantity of the slag . . . which

11   would be disposed of would vary, however it would average out to approximately 500 to 1000 tons

12   per month.").  Slag was sometimes loaded onto trucks and removed from the Site for disposal.

13   (See id., Exh. 48 (Finkelstein Depo.) at 48 & 50-51; id., Exh. 49 (Campbell Depo.) at 87 & 90).

14   In 1979, after New Southwest Steel sold the Site to Shama GP, slag remained on the Site.

15   (See id., Exh. 26 (deposition of Louis J. Lee, vice-president of Woodward-Clyde Consultants,

16   which worked on Site in 1979) ("Lee Depo."), Exh. 2 thereto (Woodward-Clyde Consultants

17   Limited Soil Investigation regarding Site) at 4 (describing area of Site as "covered by 1 to 2 feet

18   of moderately to well compacted slag") & 6 (Louis J. Lee's signature and title)).

19   The EAFs also generated gas, particulates and dust.  (See Evid. App'x, Exh. 48 (Finkelstein

20   Depo.) at 53-55).  The Finkelstein entities and later New Southwest Steel used a system of ducts

21   and bag houses to control the EAF emissions.  (See id., Exh. 48 (Finkelstein Depo.) at 54-55; id.,

22   Exh. 49 (Campbell Depo.) at 63-64).  Leland Finkelstein ("Finkelstein") – who worked on the Site

23   from 1952 until 1976, (see id., Exh. 48 (Finkelstein Depo.), Exh. 170 thereto (Finkelstein Decl.)

24   at ¶¶ 5 & 23) – testified that as often as four times annually, the bags designed to capture EAF

25   emissions sustained small holes, which allowed EAF particulates to escape.  (See id., Exh. 48

26   (Finkelstein Depo.) at 55-56 & 235-36).  The dust captured by the filter bags was removed by

27   covered trucks and disposed of at a specialized landfill.  (See id., Exh. 49 (Campbell Depo.) at 94).

28   Finkelstein testified that EAF dust "spilled" in the process of shaking out the filter bags into trucks

1  for disposal, (see id., Exh. 48 (Finkelstein Depo.) at 233-34), and that he saw "quite a bit of dust

2  on the ground[.]"  (Id. at 271).  New Southwest Steel installed additional ductwork and bag houses

3  to control the EAF emissions.  (See id., Exh. 49 (Campbell Depo.) at 63-64).

4      In March 2008, HACLA purchased the Site to redevelop as mixed use public housing.  In

5  2009, HACLA engaged Andersen Environmental ("AE") to "identify recognized environmental

6  conditions associated with" the Site that might require further investigation before the proposed

7  redevelopment project could proceed.  (See Evid. App'x, Dkt. No. 615, Exh. 42 (AE Final Interim

8  Remedial Action Plan) ("IRAP") at 6-7.  Based on assessments and previous investigations

9  indicating environmental contamination, HACLA engaged in further investigation, (see id. at 7),

10  which revealed levels of several chemicals, including arsenic and lead, that were present in levels

11  that exceed commercial and residential California Human Health Screening Levels ("CHHSL").

12  (See id. at 9, 11 & 16).  Based on the investigations and assessments, AE developed a human

13  health risk assessment ("HHRA") in conjunction with the California Departments of Environmental

14  Protection and Toxic Substance Control ("DTSC") identifying the chemicals present at the Site,

15  including lead and arsenic, that posed "an unacceptable risk to future residential users."  (See id.

16  at 14-15).  HACLA and AE then developed a remedial action plan for the Site.  (See id. at 25-36).

17  The DTSC approved the remediation plan for the Site contained in the Final IRAP submitted to

18  the agency on June 30, 2014.  (See id., Exh. 41 (Declaration of Brian Martasin [AE geologist] in

19  Support of Motion) ("Martasin Decl.") at ¶ 13).

20      HACLA filed the instant action against numerous defendants – including the Finkelstein

21  entities, PCC Tech, and New Southwest Steel, (see 5AC, Dkt. No. 360, at ¶¶ 6-7, 19-21, 25-27

22  & 30-31) – in 2011 asserting claims for:  (1) violation of CERCLA, 42 U.S.C. § 9607(a);  (2) the

23  Hazardous Substances Account Act ("HSAA"), Cal. Health & Safety Code § 25363(e); (3) private

24  nuisance; (4) trespass; (5) negligence; and (6) declaratory relief.[5]  (See id. at ¶¶ 52-92).

25

26      [5]  The court dismissed HACLA's claim for negligent misrepresentation against 9901 Alameda,

27  LLC ("9901 Alameda") and one of its principals, John Maddux, (see 5AC, Dkt. No. 360, at ¶¶ 94-
   104), for lack of supplemental jurisdiction.  (See Court's Order of August 18, 2014, Dkt. No. 520,

28  at 6-11 & 19).

**LEGAL STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  477 U.S. at 250, 106 S.Ct. at 2511.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).  A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.  See SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).

If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested.  See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[6]  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see also Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

---

[6]  "In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Issues' and (b) controverted by declaration or other written evidence filed in opposition to the motion."  Local Rule 56-3.

1    In determining whether a triable issue of material fact exists, the evidence must be
2    considered in the light most favorable to the nonmoving party.  See Barlow v. Ground, 943 F.2d
3    1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206 (1992).  However, summary judgment
4    cannot be avoided by relying solely on "conclusory allegations [in] an affidavit."  Lujan v. Nat'l
5    Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus.
6    Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a
7    "metaphysical doubt" is required to establish a genuine issue of material fact).  "The mere
8    existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive
9    summary judgment; "there must be evidence on which the [fact finder] could reasonably find for
10   the plaintiff."  Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

11                                              **DISCUSSION**
12   I.    THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND
13         LIABILITY ACT.
14         The CERCLA "was enacted in response to the serious environmental and health risks
15   posed by industrial pollution."  United States v. Bestfoods, 524 U.S. 51, 55, 118 S.Ct. 1876, 1881
16   (1998).  The CERCLA "both provides a mechanism for cleaning up hazardous-waste sites and
17   imposes the costs of the cleanup on those responsible for the contamination."  Pennsylvania v.
18   Union Gas Co., 491 U.S. 1, 7, 109 S.Ct. 2273, 2277 (1989), overruled on other grounds by
19   Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66 (1996).  "Persons who incur such response costs
20   may be able to recoup them from other potentially responsible parties ('PRPs') through a 'cost
21   recovery' action under [42 U.S.C. § 9607(a)] . . . , or a 'contribution' action under [42 U.S.C. §
22   9613(f)]."  Hobart Corp. v. Waste Mgmt. of Ohio, Inc., 923 F.Supp.2d 1086, 1091 (S.D. Ohio
23   2013).  "[T]he Act is to be given a broad interpretation to accomplish its remedial goals."  3550
24   Stevens Creek Associates v. Barclays Bank of California, 915 F.2d 1355, 1363 (9th Cir. 1990),
25   cert. denied 500 U.S. 917 (1991).
26         "To state a prima facie case under CERCLA . . . a plaintiff must allege: (1) the waste
27   disposal site is a 'facility' within the meaning of 42 U.S.C. § 9601(9); (2) a 'release' or 'threatened
28   release' of a 'hazardous substance' from the facility has occurred[;] (3) such release or 'threatened

8

1  release' will require the expenditure of response costs that are 'consistent with the national
2  contingency plan'[;] and, (4) the defendant falls within one of four classes of persons subject to
3  CERCLA's liability provisions."  Cose v. Getty Oil Co., 4 F.3d 700, 703-04 (9th Cir. 1993) (citing
4  42 U.S.C. § 9607(a)).

5        The CERCLA defines the four classes of potentially responsible parties ("PRPs") under the
6  CERCLA as: "(1) the owner and operator of a vessel or facility, (2) any person who at the time of
7  disposal of any hazardous substance owned or operated any facility at which such hazardous
8  substances were disposed of, (3) any person who by contract, agreement or otherwise arranged
9  for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of
10 hazardous substances owned or possessed by such person, by any other party or entity, at any
11 facility or incineration vessel owned or operated by another party or entity and containing such
12 hazardous substances, and (4) any person who accepts or has accepted any hazardous
13 substances for transport to disposal or treatment facilities, incineration vessels or sites selected
14 by such person, from which there is a release, or a threatened release which causes the
15 incurrence of response costs, of a hazardous substance[.]"  42 U.S.C. § 9607(a).

16       "CERCLA imposes strict liability on all entities that have owned or operated facilities at
17 which hazardous substances were disposed."  Anderson Bros. v. St. Paul Fire & Marine Ins. Co.,
18 729 F.3d 923, 929 (9th Cir. 2013) (footnote and internal quotation marks omitted); see also Prisco
19 v. A & D Carting Corp., 168 F.3d 593, 603 (2d Cir. 1999) ("Once the plaintiff establishes these
20 elements, the defendant is strictly liable for the presence of the hazardous substances unless it
21 succeeds in invoking one of the statutory defenses set forth in [42 U.S.C. § 9607(b)(3).]").

22 II.    THERE WAS A DISPOSAL OF HAZARDOUS SUBSTANCES AT THE SITE DURING
23       DEFENDANTS' OWNERSHIP AND OPERATION.

24       It is undisputed that the Site is a 'facility' as defined by CERCLA, 42 U.S.C. § 9601(9)(B),
25 (see Joint Br., Dkt. No. 615, at 25), and that there has been – at some point in time – a release
26 of hazardous substances at the Site.  (See id. at 2) ("No one denies that lead and arsenic are
27 present in the soil at the Site."); Louisiana-Pacific Corp. v. ASARCO, Inc., 24 F.3d 1565, 1573 (9th
28 Cir. 1994), cert. denied 513 U.S. 1103 (1995), (lead and arsenic are hazardous substances under

1   42 U.S.C. §§ 9601(14)(A), (B) and (D)); 40 C.F.R. §§ 302.4, 401.15 & 116.4 (arsenic, lead, and
2   compounds thereof are hazardous substances under CERCLA and Clean Water Act).

3        HACLA requests partial summary judgment on one issue: defendants' status as PRPs
4   under CERCLA. (See Joint Br., Dkt. No. 615, at 1). HACLA argues that defendants are liable
5   under § 9607(a)(2) as former owners and/or operators of the Site. (See id. at 31-36). Defendants,
6   while acknowledging they are past owners or operators of the Site, (see SOUF, Dkt. No. 615, at
7   P23, P27, P30-P36, P38-P40, P60, P78, P96 & P99-P101), argue that HACLA has not met its
8   burden of showing they are PRPs because it has failed to demonstrate that there was a 'disposal'
9   of any 'hazardous substance' within the meaning of CERCLA during their periods of ownership
10  or operation at the Site. (See Joint Br., Dkt. No. 615, at 26-31).

11       A.    Hazardous Substance.

12       Defendants advance no argument that EAF emissions and dust do not constitute hazardous
13  substances within the CERCLA. (See, generally, Joint Br., Dkt. No. 615); see Anderson, 477 U.S.
14  at 256, 106 S.Ct. at 2514 (party opposing a properly supported motion for summary judgment
15  "must set forth specific facts showing that there is a genuine issue for trial."); Mutual Fund
16  Investors, Inc. v. Putnam Management Co. Inc., 553 F.2d 620, 625 (9th Cir. 1977) (summary
17  judgment warranted where party opposing motion presents no evidence to contradict the movant's
18  evidence and the moving papers disclose no genuine issue of material fact). Thus, it is undisputed
19  that the EAF emissions and dust contain arsenic and lead, and constitute hazardous substances
20  within the meaning of CERCLA. (See Evid. App'x, Dkt. No. 615, Exh. 40 (Kadlec Report) at 12)
21  (EAF emissions "contain[] harmful quantities of heavy metals such as lead[] . . . and arsenic."); (id.
22  at 20) (EAF emissions "caused the measured and documented extensive and wide spread
23  hazardous and harmful emissions on the [Site] including lead and arsenic."); (id., Exh. 46
24  (Deposition of Mark S. Cousineau [expert for numerous defendants]) ("Cousineau Depo."), Exh.
25  817 thereto (Mark S. Cousineau expert rebuttal report) ("Cousineau Report") at 19) ("In my
26  opinion, it is more likely than not that dust from the baghouse and furnace were released into the
27  prevailing wind" which "account[s] for the deposition of lead and arsenic").

28

1    Defendants, however, dispute that slag is a hazardous substance within the meaning of

2    CERCLA.  (See Joint Br., Dkt. No. 615, at 30-31).  CERCLA defines 'hazardous substance' as:

3          (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal

4          Water Pollution Control Act [33 U.S.C. § 1321(b)(2)(A)], (B) any element,

5          compound, mixture, solution, or substance designated pursuant to section

6          9602 of this title, (C) any hazardous waste having the characteristics

7          identified under or listed pursuant to section 3001 of the Solid Waste

8          Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation

9          of which under the Solid Waste Disposal Act [42 U.S.C.A. §§ 6901 et seq.]

10          has been suspended by Act of Congress), (D) any toxic pollutant listed under

11          section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. §

12          1317(a)], (E) any hazardous air pollutant listed under section 112 of the

13          Clean Air Act [42 U.S.C. § 7412], and (F) any imminently hazardous chemical

14          substance or mixture with respect to which the Administrator has taken action

15          pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. § 2606].

16

17    42 U.S.C. § 9601(14).  Lead and arsenic are hazardous substances under 42 U.S.C. §§

18    9601(14)(A), (B) and (D).  See Asarco, 24 F.3d at 1573; 40 C.F.R. §§ 302.4, 401.15 & 116.4

19    (listing arsenic, lead, and compounds thereof as hazardous substances under CERCLA and Clean

20    Water Act).  "It is sufficient for CERCLA regulation that a substance is covered by any of the

21    subsections of section 9601(14)."  Asarco, 24 F.3d at 1573.

22    Here, it is undisputed that the slag at the Site contains arsenic and lead.  (See SOUF, Dkt.

23    No. 615, at P205-P206; Evid. App'x, Dkt. No. 615, Exh. 56 (Declaration of John R. Bollier

24    ("Bollier") [geologist at Stantec Consulting Services, retained by defendants] ("Bollier Decl."), ¶ 5

25    (describing slag analysis at Site) & Exh. B (Laboratory Analysis Results indicating existence of

26    lead and arsenic in slag)).  According to Kadlec Engineering ("Kadlec"), the expert retained by

27    HACLA, "[c]hemically, . . . slag formation includes . . . heavy metals such as lead and arsenic[,]"

28    and the slag produced on the Site was no exception.  (See Evid. App'x, Dkt. No. 615, Exh. 40

(Kadlec Report) at 8 & 21).  Kadlec concluded that the slag on the Site "caused the measured and documented extensive and wide spread hazardous and harmful emissions on the [Site] including lead and arsenic."  (See id. at 20).  Defendants' expert, Mark S. Cousineau, (see id., Exh. 46 (Cousineau Depo.) at 115-16), also concluded that slag storage contributed to lead contamination on the Site.  (See id. at 193 & 231; Exh. 817 thereto (Cousineau Report) at 16) (describing "the former steel mill operations" as "potential sources of metals and other contaminant impacts").

Although defendants do not contest that the slag contains arsenic and lead in their portion of the Joint Brief, (see, generally, Joint Br. at 30-31), they contend that it is not a 'hazardous substance' under CERCLA because it qualifies for an exception under 42 U.S.C. § 9601(14)(C).[7] (See Joint Br., Dkt. No. 615, at 30-31).  However, "the specific exception for slag in subsection (C) of section 9601(14) of CERCLA applies only to that subsection and . . . slag and its components are regulated to the extent they fall within any of the other subsections of section 9601(14)." Asarco, 24 F.3d at 1574 (affirming district court's finding that slag is hazardous waste under CERCLA where it was found to contain copper, lead, arsenic and zinc); see also Eagle-Picher Industries, Inc. v. U.S. E.P.A., 759 F.2d 922, 927 (D.C. Cir. 1985) (argument that mining waste and fly ash were not hazardous substances within CERCLA does not comport with plain meaning of 42 U.S.C. § 9601(14) because those substances are only exempted under subsection (C) while other subsections of § 9601(14) regulate the products' constituent elements, "such as arsenic, cadmium, and selenium").  "The fact that slag is excepted from subsection (C) by the Bevill

---

[7] Title 42 U.S.C. § 9601(14)(C) defines 'hazardous substance' as "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. §§ 6901 et seq.] has been suspended by Act of Congress)[.]"  Title 42 U.S.C. § 6921(b)(3)(A)(I), i.e., the "Bevill Amendment," provides the following exception for slag:

> Notwithstanding the provisions of paragraph (1) of this subsection, each waste listed below shall, except as provided in subparagraph (B) of this paragraph, be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subchapter until at least six months after the date of submission of the applicable study required to be conducted under subsection (f), (n), (o), or (p) of section 6982 of this title and after promulgation of regulations in accordance with subparagraph (C) of this paragraph: [¶] (I) . . . slag waste[.]

1  Amendment has no bearing on whether slag in its component forms is excepted from the other

2  subsections." Asarco, 24 F.3d at 1573; see also State of Arizona v. Motorola, Inc., 774 F.Supp.

3  566, 571 (D. Ariz. 1991) ("Motorola") ("A material that is not hazardous under the Resource and

4  Recovery Act ('RCRA'), 42 U.S.C. § 6901, et seq., may still be considered a hazardous substance

5  under CERCLA."). Thus, the exception set forth in subsection (C) has no bearing on the court's

6  determination that the slag constitutes a hazardous substance within the meaning of CERCLA

7  subsections (A), (B) and (D) of § 9601(14).

8       Defendants also assert that, for the slag at the Site to qualify as a hazardous substance,

9  "HACLA must show that the slag leached hazardous materials into the Site." (Joint Br., Dkt. No.

10 615, at 31) (citing Asarco, 24 F.3d at 1574). Contrary to defendants' assertion, whether the slag

11 leaches into the soil is not the standard for whether it qualifies as a hazardous substance under

12 CERCLA. "CERCLA does not impose any quantitative requirement on what constitutes a

13 'hazardous substance.'" Motorola, 774 F.Supp. at 571. Defendants' slag "must be evaluated on

14 the basis of what contains; if a waste material contains hazardous substance – regardless of the

15 volume or concentration – then the waste itself is hazardous for purposes of CERCLA." Id. at 572.

16 "It is sufficient for CERCLA regulation that a substance is covered by any of the subsections of

17 section 9601(14)." Asarco, 24 F.3d at 1573. As one court put it, "as long as a substance is on

18 one or more of the lists identified at 42 U.S.C. § 9601(14), it is a hazardous substance irrespective

19 of the volume or concentration of the substance at the site in question." United States v. Nicolet,

20 Inc., 712 F.Supp. 1205, 1207 (E.D. Pa. 1989); see City of New York v. Exxon Corp., 766 F.Supp.

21 177, 184 (S.D.N.Y. 1991) ("Because the constituents of [defendant's] waste are 'listed hazardous

22 substances' under 40 C.F.R. § 302.4(a), it is not necessary to consider Section 304.4(b) and its

23 provisions for determining whether an unlisted hazardous waste is hazardous.").

24      Here, it is undisputed that the slag found at the Site contains arsenic and lead, which are

25 hazardous substances under CERCLA subsections (A), (B) and (D) of § 9601(14). Thus, the court

26 finds that defendants' slag is a hazardous substance or waste within the meaning of CERCLA.

27 See, e.g., Eagle-Picher, 759 F.2d at 927 (mining waste and fly ash properly considered hazardous

28 substances because they contained regulated substances); B.F. Goodrich Co. v. Murtha, 958 F.2d

1192, 1201 (2d Cir. 1992) (a waste product "need not be listed by name – instead of its constituent components – to fall within the [CERCLA.  For us to consider the whole separate from its hazardous constituent parts would be to engage in semantic sophistry.  When a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability."); Motorola, 774 F.Supp. at 573.

Finally, defendants' reliance on Asarco is unpersuasive.  It is clear from the Ninth Circuit's Asarco decision that leaching of hazardous constituents from slag is not required.  Although the court, in concluding its discussion regarding the exception for slag in the Bevill Amendment, used the phrase, "the components slag leaches into the soil," Asarco, 24 F.3d at 1574, nowhere in the portion of the decision relating to CERCLA liability does the court state that "leaching" of the hazardous components of the slag is required for the slag to be considered hazardous within the meaning of CERCLA.[8]  See, generally, id. at 1572-74.  In fact, the Asarco court affirmed the district court's finding that slag was a hazardous substance simply because "slag's components include copper, lead, arsenic and zinc[, and] [t]hese are hazardous substances under subsections (A), (B) and (D) of section 9601(14)."  Id. at 1573.  CERCLA applies to "a release, or a threatened release" of a hazardous substance.  See 42 U.S.C. § 9607(a)(4).  Given that a "threatened release" is sufficient under CERCLA, see Motorola, 774 F.Supp. at 575 ("a plaintiff need not prove that a specific release of a hazardous substance has occurred"), defendants' assertion that Asarco requires that HACLA must show that the slag leached into the Site, (see Joint Br., Dkt. No. 615, at 30-31), is contrary to CERCLA's "broad remedial statutory scheme and its imposition of strict liability."  Motorola, 774 F.Supp. at 572; see id. at 575 ("Congress surely did not intend to place this extra and rather strict hurdle in the way of improving the environmental welfare of this country.").

---

[8]  Putting aside the fact that defendants have misconstrued the holding in Asarco, it is noteworthy that defendants did not cite any other cases that have held the proposition they urge the court to adopt: that materials which are not specifically named as hazardous substances under CERCLA but contain such hazardous substances can only be regulated if those hazardous components leach from the material.  (See, generally, Joint Br. at 30-31).

1    In short, the evidence is undisputed that the slag, EAF emissions and dust produced by

2  defendants' steel mill operations at the Site constitute hazardous substances within the meaning

3  of CERCLA.

4         B.    Disposal.

5         Having determined that the slag, EAF emissions and dust are hazardous substances under

6  CERCLA, the next issue to consider is whether there was a 'disposal' of those materials at the Site

7  during defendants' tenure.

8         Here, it is undisputed that defendants' use of EAFs in steel mill operations at the Site

9  produced slag and EAF particulates and dust.  (See SOUF, Dkt. No. 615, at P106 & P117).

10 HACLA has produced evidence that slag was "dumped" directly onto the ground at the Site.  (See

11 id. at P107 & P174; Evid. App'x, Dkt. No. 615, Exh. 48 (Finkelstein Depo.) at 46-47 & 50-51 (slag

12 was "dumped on the ground" out of slag pot); id., Exh. 49 (Campbell Depo.) at 32).  Slag was

13 found on the Site in 1979 after its transfer to Shama GP.  (See SOUF, Dkt. No. 615, at P176);

14 (Evid. App'x, Dkt. No. 615, Exh. 26 (Lee Depo.), Exh. 2 thereto (Woodward-Clyde Consultants

15 Limited Soil Investigation regarding Site) at 4).  Finkelstein, who worked at the facility from 1952

16 to 1976, testified that the filter bags often sustained holes, which released EAF fumes and

17 particulates onto the Site, (see id., Exh. 48 (Finkelstein Depo.) at 55-56 & 235-36), and that EAF

18 dust "spilled" in the process of emptying the filter bags for disposal.[9]  (See id. at 233-34).

19 _____

20    [9]  Defendants assert that HACLA's argument ignores Finkelstein's testimony the filter bags
were contained within enclosed bag houses, and "not simply open to the environment[.]"
21 (See Joint Br. at 3).  Defendants' assertion is unpersuasive.  First, they provide no citation to the
record to support this assertion.  See Mutual Fund Investors, Inc., 553 F.2d at 625 (summary
22 judgment warranted where party opposing motion presents no evidence to contradict the movant's
evidence and the moving papers disclose no genuine issue of material fact); Local Rule 56-3 (fact
23 deemed admitted when not controverted by evidence).  Second, any such testimony does not
directly contradict or undermine his testimony that when the filter bags developed holes, the fumes
24 and particulates would emit into air and spread across the Site.  (See Evid. App'x, Exh. 48
(Finkelstein Depo.) at 234-35).  Finally, in dismissing an argument that 'disposal' under CERCLA
25 "require[s] a disposal directly into the groundwater or onto the land[,]" the Ninth Circuit has held
that 'disposal' "includes any discharge or spill of waste 'into or on any land or water so that [the
26 waste] may enter the environment'" and "cannot be interpreted to cover only spills that go directly
and immediately into the groundwater."  Voggenthaler v. Maryland Square LLC, 724 F.3d 1050,
27 1064 (9th Cir. 2013).  "[Defendant's] interpretation conflicts with our practice of construing

28

AE concluded, based on its soil samplings and analysis that there was no "point source of heavy metal . . . contamination[]" at the Site, but rather "historical industrial operations contributed to ubiquitous shallow soil impacts across the [Site]."  (See Evid. App'x, Dkt. No. 615, Exh. 42 (IRAP) at 16).  Kadlec asserts that "EAF Mini-Mill[10] documented operation history, scientific, engineering and government studies have demonstrated and shown that emissions in the form of noxious gases and hazardous particulate matter (dust) are associated with almost all phases of EAF and Steel Mini-Mill operations."  (See id., Exh. 40 (Kadlec Report) at 11).   According to Kadlec, "[i]t is inevitable that over the operation history of an EAF Steel Mini-Mill that [EAF] dust will be released to the atmosphere and ground under and surrounding the Mini-Mill equipment." (See id. at 13).  Based on defendants' continuous operation of EAFs for nearly 30 years and the widespread contamination of lead and arsenic throughout the Site, Kadlec concluded that "[t]he EAF Steel Mini-Mill operators on the subject property did not exercise adequate emission control practices[.]"  (See id. at 20).

Defendants counter that their deposit of slag at the Site was not a 'disposal' but mere "passive migration."   (See Joint Br., Dkt. No. 615, at 27-29) (citing Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 881 (9th Cir. 2001) (en banc), cert. denied 535 U.S. 971 (2002), ("Carson Harbor I")).  In Carson Harbor I, the Ninth Circuit held that "the gradual passive migration of contamination through the soil that allegedly took place during the [defendants'] ownership was not" 'disposal' under the CERCLA.  270 F.3d at 879.  Carson Harbor I, however, is inapposite because in that case, the "only evidence on [disposal was] . . . that the tar-like and slag material was deposited before 1947[,]" three decades prior to defendants' ownership of the subject property. See Carson Harbor Vill., Ltd. v. Unocal Corp., 990 F.Supp. 1188, 1194 (C.D. Cal. 1997). The plaintiff's liability theory was that "lead from the tar-like and slag materials leaked into the

_____

CERCLA liberally to achieve the goals of cleaning up hazardous waste sites promptly and ensuring that the responsible parties pay the costs of the clean up."  Id.

[10]  The Kadlec Report defines steel Mini-Mills as an operation that "uses an electric arc furnace to melt returned steel scrap to produce various steel products with both hot and cold rolling mills." (See Evid. App'x, Dkt. No. 615, Exh. 40 (Kadlec Report) at 9).

1  surrounding soil and lead from the storm water runoff leaked into the property during the time that

2  they were owners." Id.  Here, HACLA does not attempt nor does it need to make such a leap, for

3  the evidence is undisputed that defendants deposited slag directly onto the ground at the Site.[11]

4          Defendants next argue that there are material issues of fact as to whether there were EAF

5  emissions. (See Joint Br., Dkt. No. 615, at 41-42).  Defendants point to Campbell's testimony that

6  he never saw any holes in the bags, any EAF emissions escaping from the bags or any EAF dust

7  spilling during the process of emptying the filter bags.  (See Evid. App'x, Dkt. No. 615, Exh. 50

8  (Campbell Depo.) at 129 (Campbell does not remember any problems with bag house collection

9  system, characterizing it as a "very efficient operation."), 150 (describing bag emptying process

10  as "completely enclosed . . . so there was like no spillage.") & 157-58 (Campbell never observed

11  holes in the filter bags or leaks of fumes and particulates)).

12          HACLA's Motion is based on CERCLA § 107(a)(2), which defines a former owner or

13  operator as "any person who at the time of disposal of any hazardous substance owned or

14  operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. §

15  9607(a)(2).    The CERCLA defines 'disposal' by reference to the Solid Waste Disposal Act, see 42

16  U.S.C. § 9601(29), i.e.:

17          the discharge, deposit, injection, dumping, spilling, leaking, or placing of any

18          solid waste or hazardous waste into or on any land or water so that such

19          solid waste or hazardous waste or any constituent thereof may enter the

20  _____

21  [11]  Defendants' reliance on Otay Land Co. v. U.E. Ltd., L.P., 440 F.Supp.2d 1152 (S.D. Cal. 2006), vacated sub nom. Otay Land Co. v. United Enterprises Ltd., 338 F.App'x 689 (9th Cir.

22  2009), is unpersuasive and, in any event, not binding on this court.  There, the district court found that shooting lead ammunition in target practice at a shooting range did not constitute a 'disposal'

23  of hazardous waste; rather, "[t]arget practice or trap and skeet activities . . . qualify as productively using lead-containing ammunition." Id. at 1175.  It found "the sporting activity which resulted in

24  lead shot or lead pellets being deposited at the site[]" was not the discarding of waste, but a "productive use of the lead[]" qualifying for the "useful product defense." Id. (citing A & W Smelter

25  and Refiners, Inc. v. Clinton, 146 F.3d 1107, 1112 (9th Cir. 1998) (holding that unprocessed ore was not waste if it was a useful product)).  Here, by contrast, the slag defendants discharged at

26  the Site does not qualify for the useful product defense.  See A & W Smelter, 146 F.3d at 1113 ("Slag is indeed a waste by-product[.]").  As described above, defendants' slag was discharged

27  from the EAFs to the ground and periodically removed for disposal; "it was no longer usable for

28  [defendants'] principal business, [and so] it was waste." Id.

1    environment or be emitted into the air or discharged into any waters,

2    including ground waters.

3    See 42 U.S.C. § 6903(3).  "[T]he movement of contamination that . . . result[s] from human

4    conduct is a 'disposal.'"  Carson Harbor I, 270 F.3d at 877.

5    The evidence is undisputed that during the time defendants owned or operated the Site –

6    from 1938 until 1979 – hazardous substances were disposed of at the Site.  (See Evid. App'x, Dkt.

7    No. 615, Exh. 48 (Finkelstein Depo.) at 55-56 & 233-36) (filter bags developed holes and spilled

8    dust); (id. at 46-47 & 50-51; id., Exh. 49 (Campbell Depo.) at 32) (slag pots were emptied onto

9    ground); (id., Exh. 40 (Kadlec Report) at 20-21; id., Exh. 46, Exh. 817 thereto (Cousineau Report)

10   at 19) (slag storage and inadequate EAF emissions control mechanisms resulted in lead and

11   arsenic contamination).  Other than the requirement that the disposal occur during the time the

12   "person" owned or operated the Site, CERCLA's definition of 'disposal' imposes no requirements

13   for temporal frequency or the concentration of contamination, and such limitations would be

14   inconsistent with its strict liability scheme.  Just as "CERCLA does not impose any quantitative

15   requirement on what constitutes a 'hazardous substance[,]'" Motorola, 619 F.Supp. at 571, nor

16   does it impose any quantitative requirement on what constitutes a "disposal" within the meaning

17   of CERCLA.  Evidence of disposal of hazardous substances – even on one occasion – is enough

18   to impose PRP status on a former owner or operator.  See Kaiser Aluminum & Chemical Corp.

19   v. Catellus Dev. Corp., 976 F.2d 1338, 1342-43 (9th Cir. 1992) ("CERCLA's definition of 'disposal'

20   expressly encompasses the 'placing of any hazardous waste on any land.'") (emphasis added and

21   alterations in original omitted); U.S. v. CDMG Realty Co., 96 F.3d 706, 719 (3d Cir. 1996) (in

22   CERCLA's definition of 'disposal,' "[t]here is no exception for de minimis disturbances."); U.S. v.

23   Alcan Aluminum Corp., 964 F.2d 252, 260 (5th Cir. 1992) (collecting cases where, "almost

24   uniformly[,]" courts have held "CERCLA liability does not depend on the existence of a threshold

25   quantity of a hazardous substance").  Thus, Campbell's statements that he did not observe any

26   leaks or spills from the EAF bag houses or does not recall seeing any holes in the filter bags does

27   no more than establish that on the days Campbell was at the Site, he did not witness any spills

28

1  or leaks of EAF emissions.[12]  However, that does not contradict the evidence that hazardous

2  substances were disposed of at the Site during the time period that defendants owned or operated

3  the Site.  See Marchisheck v. San Mateo Cnty., 199 F.3d 1068, 1078 (9th Cir. 1999), cert. denied

4  530 U.S. 1214 (2000), (plaintiff's assertions that she did not observe notices did not directly

5  contradict testimony that the notices were posted, and did not, therefore, create a triable issue of

6  fact).

7  III.   RESPONSE COSTS.

8       As part of its prima facie CERCLA action, HACLA must show that "the 'release' or

9  'threatened release' has caused [it] to incur response costs that were 'necessary' and 'consistent

10 with the national contingency plan' [("NCP").]"  Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles,

11 433 F.3d 1260, 1265 (9th Cir. 2006); (see Joint Br., Dkt. No. 615, at 18 & 37; Supplemental

12 Memorandum of Points and Authorities of Plaintiff, [HACLA], In Support of Its Motion ("HACLA

13 Supp. Br."), Dkt. No. 680, at 1).  Defendants argue HACLA has not done so, and its failure

14 imposes a bar to the instant Motion.  (See Joint Br., Dkt. No. 615, at 37-41).

15     A.    HACLA Has Incurred Response Costs.

16       It is undisputed[13] that HACLA retained AE to perform assessment and investigation into

17 environmental contamination at the Site.  (See SOUF, Dkt. No. 615, at P202 & P204; Evid. App'x,

18 Dkt. No. 615, Exh. 41 (Martasin Decl.) at ¶¶ 4-6; id., Exh. 42 (IRAP) at 7-14).  HACLA developed

19 the HHRA to determine which contaminants required removal, and later the Final Interim Remedial

20 _____

21    [12]  Even assuming there was a genuine issue of material fact with respect to the EAF
emissions, summary judgment would still be proper based on defendants' disposal of slag at the
22 Site given the court's determination that it constitutes a hazardous substance.  At best, Campbell's
testimony goes to determining the extent of response costs for which defendants will be
23 responsible; it does not controvert evidence establishing defendants' PRP status.

24    [13]  Defendants object to plaintiff's statement of undisputed fact No. 202, i.e., "HACLA has
performed assessment and investigation of the environmental conditions at the Site[,]" on the
25 ground that HACLA cites to its response to GK Tech's interrogatories.  (See SOUF, Dkt. No. 615,
at P202).  Defendants argue that HACLA's interrogatory response is inadmissible hearsay, (see
26 id.; see also Joint Br., Dkt. No. 615, at 40), ignoring the other evidence HACLA cites to for the
proposition that it has performed assessment and investigation at the Site, namely the declaration
27 of AE's Principal Geologist regarding AE's services for HACLA and the Final Interim Remedial
Action Plan.  (See Evid. App'x, Dkt. No. 615, Exhs. 41 (Martasin Decl.) & 42 (IRAP)).
28

1    Action Plan submitted to the DTSC.  (See SOUF, Dkt. No. 615, at P208-P209 & 220; Evid. App'x,

2    Dkt. No. 615, Exh. 42 (IRAP) at 14-15 & 25-36; id., Exh. 41 (Martasin Decl.) at ¶ 6).

3            CERCLA defines "response" as, among other things, "removal," which means "such actions

4    as may be necessary to monitor, assess, and evaluate the release or threat of release of

5    hazardous substances[.]"  See 42 U.S.C. §§ 9601(23) & (25).  "[R]esponse costs under CERCLA

6    can include the costs of investigation or testing for the presence of hazardous wastes[,]" as well

7    as "[t]he costs of developing [a remedial action] plan[.]"  Ascon Properties, Inc. v. Mobil Oil Co.,

8    866 F.2d 1149, 1153-54 (9th Cir. 1989) (internal quotation marks omitted); see Wickland Oil

9    Terminals v. Asarco , Inc., 792 F.2d 887, 892 (9th Cir. 1986) ("[defendant] argues that [plaintiff's]

10   action . . . is not ripe since [plaintiff] has alleged only investigatory costs and has not alleged

11   incurrence of actual, on-site cleanup costs. The distinction that [defendant] attempts to

12   manufacture between investigatory costs and on-site cleanup costs is immaterial[.] . . . [CERCLA]

13   allows recovery of 'costs of response,' which includes the costs of 'such actions as may be

14   necessary to monitor, assess, and evaluate the release or threat of release of hazardous

15   substances.'"); United Alloys, Inc. v. Baker, 797 F.Supp.2d 974, 996 (C.D. Cal. 2011) (costs

16   incurred "assessing, evaluating, [and] monitoring" hazardous substances were response costs

17   under CERCLA); Hinds Investments, L.P. v. Ryan, 2009 WL 951155, *3 (C.D. Cal. 2009) (where

18   "[p]laintiffs . . . provided evidence that they incurred the costs of investigation[,]" they "submitted

19   uncontroverted evidence that they incurred costs in response to the release."); Soo Line R. Co.

20   v. Tang Industries, Inc., 998 F.Supp. 889, 895 (N.D. Ill. 1998) ("plaintiff's costs paid to consultants

21   to evaluate the Site and develop a plan of remedial action constitute investigation and testing costs

22   cognizable under CERCLA irrespective of whether plaintiff has incurred actual clean-up costs.");

23   Gache v. Town of Harrison, N.Y., 813 F.Supp. 1037, 1046 (S.D.N.Y. 1993) ("Under the prevailing

24   law, plaintiff might indeed recover under CERCLA for the costs borne during his initial evaluations

25   of the landfill and its alleged releases of hazardous substances into the surrounding

26   environment."); City of New York v. Chem. Waste Disposal Corp., 836 F.Supp. 968, 980 (E.D.N.Y.

27   1993) ("initial monitoring, assessment, and evaluation expenses are recoverable even absent any

28   subsequent recoverable response costs.").  Thus, defendants' argument that HACLA's CERCLA

claim against them is not ripe for adjudication, (see, e.g., Joint Br., Dkt. No. 615, at 41), is plainly without merit.   See In re Dant & Russell, Inc., 951 F.2d 246, 249 (9th Cir. 1991) ("Under CERCLA's scheme for private action, response costs may not be recovered when there has been no commitment of resources for meeting these costs. . . .  [B]efore suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. . . .  By requiring a plaintiff to take some positive action before coming to court, CERCLA ensures that the dispute will be ripe for judicial review.").

B.    Defendants' Disposal of Hazardous Substances Caused HACLA's Response Costs.

Defendants argue that summary judgment on the issue of whether or not they are PRPs under CERCLA is improper at this time because material questions of fact exist as to whether defendants caused HACLA to incur any response costs.  (See Joint Br., Dkt. No. 615, at 37-38). In support of this argument, defendants merely cite to their previous arguments that HACLA has not carried its burden of showing that there was a disposal of hazardous substances at the Site during the 40 years defendants owned or operated the Site.[14]  (See Joint Br., Dkt. No. 615, at 38). In light of the court's conclusion that no genuine issues of material fact exist regarding defendants' disposal of hazardous substances, see supra at § II, this argument fails.

C.    The Court Need Not Decide at this Juncture Whether Response Costs are Necessary and Consistent with NCP.

Defendants argue summary judgment must be denied because HACLA has not demonstrated its response costs are "necessary" and "consistent with the national contingency plan" pursuant to 42 U.S.C. § 9607(a)(4)(B).  (See Joint Br., Dkt. No. 615, at 38-41).  HACLA counters that it "does not seek, nor is it required at this time, to show that it incurred response

---

[14]   Defendants also argue that HACLA's response costs were not incurred because of defendants' contamination of the Site, but because "HACLA wants to redevelop the site for residential purposes[.]" (See Joint Br., Dkt. No. 615, at 38) (emphasis in original). Defendants put forth no legal authority to support their assertion, (see, generally, id.), let alone any authority for the proposition that liability under CERCLA is premised on the proposed use of the subject property.

costs consistent with the [NCP]."  (See HACLA Supp. Br., Dkt. No. 680, at 1).  HACLA has the better view.

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis added).  HACLA seeks partial summary judgment on whether defendants are PRPs within the meaning of CERCLA.  (See Joint Br., Dkt. No. 615, at 1 & 31-36).  Whether HACLA's response costs incurred to date, and those that will be incurred, are necessary and consistent with the NCP is a separate inquiry that does not preclude the granting of the instant Motion.  See, e.g., United Alloys, 797 F.Supp.2d at 994 (court granted summary judgment finding defendant was "PRP as an operator of the facility," "the Property was a facility," and "a release of hazardous substances occurred at the facility during [defendant's] tenancy[]" before subsequently finding plaintiff's costs necessary and consistent with NCP in bench trial); Nw. Mut. Life Ins. Co. v. Atl. Research Corp., 847 F.Supp. 389, 400 (E.D. Va. 1994) ("Here, there is no question that plaintiff has incurred some costs in responding to the release of hazardous substances at the facility. Consequently, analysis of defendants' liability under CERCLA on the other elements is proper, whether or not plaintiff can establish on summary judgment that its response costs were necessary and consistent with the NCP."); TDY Holdings, LLC v. U.S., 2011 WL 11072878, *5 (S.D. Cal. 2011) ("to prevail on the instant motion [for summary judgment on issue of whether defendant was 'owner' within CERCLA], [plaintiffs] need not show the full extent of response costs that have been or will be incurred as a result of releases at or from the Site but, instead, need only show that they have incurred some costs.") (internal quotation marks omitted) (citing In re Dant & Russell, 951 F.2d at 249).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1.  HACLA's Motion for Summary Judgment **(Document No. 615)** is **granted**.

2.  For the pendency of this action, it is hereby determined that:  (1) the Site is a 'facility' within the meaning of CERCLA, 42 U.S.C. § 9601(9)(B); (2) a release or threatened release of hazardous substances has occurred or will occur at the Site, 42 U.S.C. §§ 9601(22) & 9601(8);

1  (3) defendants are former owners and/or operators of the Site; and (4) during defendants' periods

2  of ownership and/or operation at the Site, hazardous substances, namely lead and arsenic, were

3  disposed of at the Site within the meaning of CERCLA; and, therefore, (5) defendants are

4  potentially responsible parties within the meaning of CERCLA, 42 U.S.C. §§ 9601(29), 6903(3),

5  9601(14) and 9607(a)(2).

6  Dated this 26th day of January, 2015.

7

8                                                    /s/
                                        _____
9                                          Fernando M. Olguin
                                        United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28